**Nelson Bunker HUNT and William Herbert Hunt, Appellants,**

v.

**PAN AMERICAN ENERGY, INC., a North Dakota Corporation, et al., Appellees.**

**No. 76–1015.**

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1976.

Decided Aug. 2, 1976.

Rehearing and Rehearing En Banc Denied Aug. 24, 1976.

marck, N.D., and Burns H. Errebo, Denver, Colo., on brief.

Before HEANEY and HENLEY, Circuit Judges, and SCHATZ, District Judge.*

HEANEY, Circuit Judge.

William Herbert Hunt and Nelson Bunker Hunt appeal from an order of the United States District Court for the District of North Dakota, issued after trial to the court on the issue of liability, dismissing their action against Pan American Energy, Inc., a North Dakota corporation, Melvin Ballantyne, the president of Pan American, and Mobil Oil Corporation, a New York corporation. Jurisdiction was based on diversity of citizenship, 28 U.S.C. § 1332(a). The Hunts alleged that Pan American and its president wrongfully possessed and used confidential Hunt geophysical information to purchase coal leases in North Dakota and prayed alternatively for the imposition of an implied or constructive trust or money damages. They also sought a constructive trust over whatever coal leases Mobil Oil had acquired from Pan American or Melvin Ballantyne. The allegations were generally denied with Mobil Oil asserting the defense that it was a good faith purchaser for valuable consideration. The District Court held that the Hunts failed to meet their burden of proof. We affirm. The District Court correctly applied the applicable North Dakota law to factual findings that are not clearly erroneous.

A. B. Conant, Jr., Dallas, Tex., for appellants; Patrick W. Durick, Bismarck, N.D., on brief.

Mitchell H. Mahoney, Minot, N.D., of Pringle & Herigstad, Inc., Minot, N.D., on brief for Pan American Energy, Inc. and Melvin "Pat" Ballantyne.

Leonard H. Bucklin, Bismarck, N.D., for Mobil Oil Corp.; Zuger & Bucklin, Bis-

I.

Extensive coal exploration and leasing began in western North Dakota in 1971. The Hunts, through the Hunt Oil Company, began their program of exploration and leasing in the summer or early fall of that year. They proceeded in a scientific and deliberate manner.

Initially, Hunt geologists studied all of the available published information on the coal resources of North Dakota. An independent coal exploration program was then

* ALBERT G. SCHATZ, District Judge, District of Nebraska, sitting by designation.

instituted to find and delineate the areas that contained commercial coal. The determination of what coal beds were mineable was made by Hunt geologists who used predetermined parameters of, *inter alia,* seam thickness, amount of overburden, availability of transportation facilities and proximity of water supplies. The operation was directed and controlled from the Hunts' Dallas, Texas, headquarters.

Contract drillers were employed to take test samples at locations specified by Hunt representatives. To this end, mobile drilling rigs drilled holes two hundred feet in depth and samples of the cuttings for each five-foot interval were laid on the ground for observation. This drilling activity was observable by anyone in the vicinity.

Loggers, employed directly by the Hunts, followed the drilling crews. They observed the cutting samples that had been laid on the ground and electronically logged the hole. A hole was electronically logged by recording in graph form the pattern of gammaray emissions that resulted when a sonde, which had been dropped to the bottom of the hole, was reeled up. The location, designated by legal description, and an identification number for the drill hole were noted on the face of each log by the logger. The identification number consisted of an alphabetical prefix to Arabic numerals. The same information was noted on a legal pad with the logger's visual observation of the cutting samples. Finally, a map of the area that showed the locations and identification numbers for the holes previously drilled was updated. The area map permitted a logging crew to follow a number of drilling crews and ensured, in theory, that there would not be a duplication of identification numbers.

The original logs along with the descriptions of the logger's visual observations were delivered by each logger to the Hunt geologists. Delivery was made either by mailing the logs and descriptions on a daily or near daily basis directly to Dallas or by giving the material directly to a Hunt geologist at the North Dakota headquarters located in Williston. In the latter case, the geologist would summarily process the data before sending it to Dallas.

Todd Ballantyne, a son of Melvin Ballantyne, was employed by the Hunts as a logger from October 23, 1972, to December 22, 1972. During that period, Mark Reishus, a Hunt geologist, was usually stationed at the Williston office. Reishus is a friend and former employee of Melvin Ballantyne.

Core samples of the coal seams were also taken at the direction of Hunt geologists. The analysis of the core samples provided information as to the quality of the coal seams. Copies of the logs for those drill holes from which the core samples were to be taken were returned from the Dallas to the North Dakota office. Todd Ballantyne took core samples while employed by the Hunts.

From the data collected, the Hunt geologists determined the areas that contained commercial coal from which leases were to be taken. Maps were prepared delineating these areas, referred to throughout the proceedings as buy areas, for the Hunt landmen who purchased the desired coal leases. Copies of these buy area maps were always kept at the Hunts' North Dakota office.

This scenerio of data collection to lease purchase was altered occasionally because of the dynamic environment in which the coal exploratory program was operating. When a log denoted a particularly thick seam of coal, a tentative buy area was immediately established and leases were taken while the final outline of the buy area was determined.

During the period of the Hunts' coal exploration and leasing program, from mid-1972 to early 1973, approximately 2,200 test holes were drilled at a cost of $385,000, and approximately twenty-two buy areas were established. The total Hunt investment, including the cost of the leases acquired and the salaries of geologists and landmen, was $1,178,818.

Melvin Ballantyne also became interested in the coal resources of his home state, North Dakota, in the fall of 1971. Pan American Energy, Inc., was organized as

the vehicle through which coal leases would be purchased. Other interested persons and beneficial owners of the leases taken by Pan American are Melvin's brothers, Russell and Charles, and the Ballantyne Family Trust. The Ballantynes' method of operation contrasted sharply with that of the Hunts. No geologists were employed. They gathered the information necessary to determine the areas in which they desired to purchase coal leases from available publications on the coal resources of North Dakota, from visual observation of where other companies were drilling, from the recorded coal leases in the county courthouses showing where other companies were buying and from conversation with farmers in areas generally considered to contain coal. Charles was the field man for the operation. He compiled the data from the recorded leases and watched the activities of the other companies. Melvin would plot the data furnished by Charles on maps and determine the areas in which leases were to be taken. Copies of the maps were then given to Charles who directed the landmen. During much of the time at issue, Melvin resided at his winter home in Palm Springs, California. The Ballantynes purchased leases from October, 1972, until the spring of 1973. The first leases were not recorded, however, until February, 1973. Their purpose was to acquire large blocks of leases for sale to major coal companies. After negotiations, which began in June, 1973, the Ballantynes entered into a purchase agreement with Mobil Oil on July 2, 1973. Under the agreement, Mobil Oil took all of the Ballantyne leases subject to the right to return any particular lease.

The Hunts first noticed the competition of the Ballantynes in February, 1973, and suspected that the latter were benefiting from the use of their confidential geophysical data. Efforts were made by the Hunts to substantiate their suspicions, and Mobil Oil was contacted directly in September, 1973, to determine what data it had received from the Ballantynes. Gene Hixson, Mobil Oil's exploration manager for oil shale and oil in North America, was asked to compare a copy of a Hunt log to the materials received from the Ballantynes and was requested to permit the Hunt representative, Jim Beavers, to examine those materials. On advice of Mobil Oil's counsel, that request was denied. The Hunts were unwilling to seek direct permission from Melvin Ballantyne, who, upon request, obtained the return of his materials from Mobil Oil. The Hunts filed suit in October, 1973.

## II.

The Hunts' case for the imposition of a constructive trust over the Ballantyne leases is premised on the theory that Todd Ballantyne or Mark Reishus, or both, passed confidential Hunt geophysical information to the principals of Pan American who used that information to purchase leases.[1] North Dakota law controls:

An implied trust arises in the following cases:

  *       *       *       *       *       *

2. One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an implied trustee of the thing gained for the benefit of the person who would otherwise have had it [.]

N.D.C.C. 59–01–06.

We, like the District Court, do not interpret the statute to require a showing

1. The Ballantynes concede that they possessed Hunt information that was not geophysical in nature. They received from Todd a listing of the Hunt drill hole locations and claim that they also possessed the identification numbers for those locations. The Ballantynes claim that Todd did not give them the data until after they had purchased their leases, and that the data was used only to promote their sale to Mobil Oil.

Whether possession by the Ballantynes of Hunt drill hole locations and identification numbers, assuming their use in the purchasing of leases, would support the imposition of a constructive trust under North Dakota law is an issue we need not decide. The Hunts' complaint and the trial to the court below did not encompass this theory. It cannot be asserted for the first time on appeal. *Katsev v. Coleman,* 530 F.2d 176, 180 (8th Cir. 1976).

that the wrongfully appropriated data was the exclusive basis for the Ballantyne purchases. Indeed, it is not contended otherwise. The Ballantynes have premised their case on the proposition that they did not use confidential Hunt geophysical information. Having admitted of no unlawful use, they have not presented the strong evidence necessary to show that particular leases were purchased innocently, thereby exculpating those leases from the imposition of a constructive trust should the Hunts prevail. *See Hunter v. Shell Oil Co.,* 198 F.2d 485, 490 (5th Cir. 1952). Our review of the record facts is made in that light: a constructive trust is warranted under North Dakota law if the evidence shows that the Ballantynes used Hunt geophysical information to purchase leases.

■ But there must be that causal connection. The Ballantynes can be constructive trustees of only those leases gained by the wrongful act. *Bodding v. Herman,* 76 N.D. 324, 35 N.W.2d 561, 563 (1949); N.D. C.C. 59–01–06. *See E. W. Bliss Company v. Struthers-Dunn, Inc.,* 408 F.2d 1108, 1112 (8th Cir. 1969); *Pratt v. Shell Petroleum Corporation,* 100 F.2d 833, 836 (10th Cir. 1938), *cert. denied,* 306 U.S. 659, 59 S.Ct. 775, 83 L.Ed. 1056 (1939). Proof of unlawful use of Hunt data in one area is not proof as to all areas. There is no basis to conclude that such was or could be the case. Geophysical data from one area of North Dakota did not provide information of the coal resources in another area of the state.

The causal connection is between the use of Hunt data for a particular area and the leases taken for that area. The District Court cited with approval *Hunter v. Shell Oil Co., supra* at 490:

It is unnecessary that plaintiff establish every transaction with separate, independent and isolated proof of the influence and effect of Hunter's information upon that particular transaction viewed *in vacuo.* It is enough that the circumstances, taken as a whole, constitute clear, convincing and trustworthy proof as to each tract.

It analyzed the proof as it related to each "tract," or in the terminology of the parties, each Hunt buy area. This was proper.

■ To prevail, the Hunts must show that the Ballantynes purchased coal leases in a particular area on the basis of Hunt geophysical information by clear and convincing proof. The moving party "bears a heavy evidentiary burden." *Scheid v. Scheid,* 239 N.W.2d 833, 838 (N.D.1976). As stated in the state's leading case:

The evidence to establish an implied trust, however, must be clear and convincing. There must be a satisfactory showing of a wrongful detention of the property, or fraud, undue influence, the violation of a trust, or other wrongful act by virtue of which the party is holding title to property which he should not hold under the rules of equity and good conscience. The evidence must be strong enough to lead to but one conclusion. If the evidence is doubtful or capable of reasonable explanation upon theories other than the existence of a trust it is not sufficient to establish a trust.

*Bodding v. Herman, supra* at 563. *See also Kutchera v. Kutchera,* 189 N.W.2d 680, 687 (N.D.1971); *Sprenger v. Sprenger,* 146 N.W.2d 36, 42 (N.D.1966).

■ While the evidentiary burden is onerous, it does not deny the Hunts the reasonable inferences from the facts proved. Circumstantial evidence is no less probative than direct evidence. Moreover, an innocent circumstance may take on a different light when the evidence is viewed in its entirety. *Hunter v. Shell Oil Co., supra* at 490. We repeat the directive of *United States of America v. Empire Gas Corporation,* 537 F.2d 296 (8th Cir. 1976), which is equally applicable here:

We have stressed the importance of viewing the evidence as a whole to give the antitrust plaintiff the full benefit of his proof, rather than tightly compartmentalizing the case and wiping the slate clean after considering each piece of evidence.

■ But we not sit to try cases *de novo.* The scope of review is limited by the clearly

erroneous rule. F.R.Civ.P. 52(a). The issue is not whether we would have made the same findings as the District Court but whether, after reviewing the entire evidence, we are left with a firm and definite conviction that a mistake has been made. The burden is upon the Hunts to clearly demonstrate error. *Lindsay v. McDonnell Douglas Aircraft Corporation,* 485 F.2d 1288, 1289 (8th Cir. 1973)(per curiam); *St. Louis Typographical Union No. 8 v. Herald Company,* 402 F.2d 553, 557–558 (8th Cir. 1968).

### III.

■ The District Court's unreported memorandum of decision and order evinces a thorough and evenhanded consideration of the evidence presented by the parties. It said in conclusion:

> After a careful consideration of the mass of evidence presented in this case, the Court is left with a distinct impression that it was not beyond the propensity of Pan American Energy, Inc., or its principals, to have, in fact, sought to obtain confidential geophysical information belonging to the plaintiffs, and to have used that information for the purpose of securing coal leases.
>
> However, the law places a heavy burden on the plaintiffs, requiring them to prove their allegations by clear and convincing evidence so as to leave no substantial doubt in the mind of the trier of facts. The Court is further impressed with the thorough investigation and preparation for trial carried on by the plaintiffs in their efforts to meet the burden.
>
> Those extensive efforts failed to uncover substantial clear and convincing direct or circumstantial evidence of such wrongdoing sufficient for the Court to find that Pan American Energy, Inc., coal leases were obtained by the use of confidential Hunt information.

The District Court viewed the Ballantynes for what they were: promoters of questionable integrity. In the light of this observation, which is fully supported by the record, we cannot conclude that the court accorded the Ballantynes' testimony undue weight. *See Snodgrass v. Nelson,* 503 F.2d 94, 96 (8th Cir. 1974) (per curiam). The ultimate issue was not whether the Ballantynes' purported method of operation was the method used in fact but whether the Hunts' allegations were proved by clear and convincing evidence. It is the failure to prove the latter which the District Court found dispositive. It said:

> What the Ballantynes "needed" for their leasing operation and whether the data they purportedly had was sufficient to make reasonable judgments is debatable, but the fact that it is debatable causes the proof to fall short of meeting the required clear and convincing standard for this Court to find that the leases were obtained through the use of confidential Hunt information. To prove the nonfeasibility of a purported method operation is not sufficient. The required proof goes one step further, and the plaintiffs have failed on that step.

We similarly view the Ballantynes' explanation of the facts with skepticism.

### A.

Before examining the evidence that relates specifically to the Ballantyne purchases of coal leases in specific areas, we review the evidence that relates generally to the question of whether the Ballantynes used confidential Hunt data.

#### 1. Todd Ballantyne.

■ Melvin Ballantyne's son Todd was employed by the Hunts from October 23, 1972, to December 22, 1972. Todd was hired by Mark Reishus after consultation with D. A. Zimmerman, the other principal Hunt geologist in North Dakota. Todd, a college student, was available for employment during that period because he was temporarily suspended from school because of poor grades.

It is a significant coincidence, not mentioned by the District Court, that Todd began his employment with the Hunts at the time that Melvin purchased his first coal

leases. The latter's active involvement in that activity was concealed from the Hunts, although Zimmerman knew that Melvin had the potential to enter the coal leasing business. Had Zimmerman or Reishus known of the Ballantynes' actual interest, Todd would not have been hired.

This coincidence must, however, be viewed along with other facts. The District Court was correct in concluding that the opportunity for Todd to acquire confidential Hunt logs was minimal. Except for the very few logs returned to the Hunts' North Dakota office, all of the logs, originals and copies, were kept at the Dallas office. The logs were delivered directly to Dallas by each logger or by a Hunt geologist.

But while the opportunity was minimal, the evidence does not warrant the inference that Todd could not have acquired at least some of the Hunt logs. Of course, Todd had access to those logs which he made. Indeed, he admitted retaining copies of fourteen such logs as souvenirs of his employment. Four of those logs were from an area near his father's farm. In addition, Todd made interpretations, however rough, of six other logs from the same area. These copies were made on the Hunts' copying machine in North Dakota and on a commercial copying machine outside the office. None of the logs showed commercial coal. Of all of the Hunt logs that were made during Todd's employment, only sixty-four showed coal deposits. The logs that did not show commercial coal were valuable only in that they disclosed where not to purchase leases.

The District Court was clearly erroneous in its conclusion that Todd had only a minimal opportunity to acquire Hunt buy area maps. The evidence is undisputed that copies of these maps were always kept at the North Dakota office.

We do, however, agree with the District Court that this evidence alone is not clear and convincing proof that the Ballantynes used confidential Hunt information to purchase coal leases. Todd worked in only four of the twelve counties where the Ballantynes are alleged to have wrongfully pur-

chased leases and his access to the logs of others was very limited. Moreover, the evidence was that Todd did not show his father the Hunt information he retained until after the Ballantyne leases were purchased in June, 1973, for the purpose of promoting their sale.

2. Mark Reishus.

The Hunts also allege that Mark Reishus passed their confidential data to the Ballantynes. Reishus was a friend of the Ballantynes since his youth, he received financial help from them for his college education and was employed by them as a geologist after he received his degree. The Hunts do not rely solely on this personal friendship to prove their allegation.

In the fall of 1973, Melvin Ballantyne gave Reishus two checks totaling $4,000. The first check was made for $2,500 and the second check was made for $1,500. Reishus testified that the transaction was a loan made necessary because of his personal financial difficulties. Melvin's testimony was to the same effect, and his books, prepared by an accountant, substantiated the loan nature of the transaction. The Hunts dispute this characterization of the transaction because no promissory notes were given when the checks were issued and because Reishus did not admit, when first questioned by a Hunt private detective, to the receipt of the second check.

Reishus attributed his failure to be candid when first questioned to his fear of losing his job. He denied that he gave the Ballantynes any confidential Hunt information. The District Court, which had the opportunity to observe the demeanor of the witness, accepted the explanation of the transaction and the denial of wrongdoing. It found Reishus' testimony to be forthright and credible. This finding was corroborated by the fact that Reishus passed a polygraph examination conducted at the direction of the Hunts. Weight was also placed upon the fact that Reishus did not leave the Hunts' employ until some months after the suit was initiated.

The Hunts challenge the District Court's acceptance of Reishus' testimony on the basis of the testimony of Bruce Alfson, an independent lease broker from Williston, North Dakota. Alfson testified that Charles Ballantyne told him that Pan American received all of its coal information from Reishus. Charles denied the statement.

The District Court disbelieved Alfson. The statement by Charles was allegedly made in December, 1972, at Charles' Minot, North Dakota, office. It was the first time that the two men had met, and the meeting was for the purpose of discussing oil and gas, not coal, leases. It was a most improbable occasion for Charles to admit to unlawful activity.

Alfson first relayed his conversation with Charles to Ray Kemmis, a former district landman for the Hunts and a personal friend. Kemmis, like Alfson, officed in Williston. Yet, while Alfson thought the matter was important, he did not disclose it for some time. Alfson stated that he told Kemmis of the conversation within two or three months. The latter stated that he first heard of the matter from Alfson after the Hunts had initiated suit, some ten months from the time of the conversation. In any event, Alfson's account of the conversation to Kemmis was not the same as his testimony at trial. According to Kemmis, Alfson, after meeting with Charles, had only the feeling that somehow the Ballantynes had access to Hunt information.

The District Court properly discounted the probative force of the Alfson testimony. It was not in error when it concluded that the evidence was not clear and convincing that the Ballantynes received Hunt geophysical information from Reishus. Moreover, we are of the opinion that the evidence presented to implicate Reishus in the allegedly unlawful scheme of the Ballantynes has little, if any, probative force when the record is considered in its entirety.

### B.

The Ballantyne leases in approximately twelve counties of western North Dakota that are in or near approximately fifteen of the Hunt buy areas are alleged to have been purchased with the use of Hunt geophysical information. We turn first to those buy areas where the proof clearly fails to substantiate the allegation.

### 1. Niobe-Coteau.

The Ballantynes purchased seven leases totaling 4,122 acres in Burke County near the Hunts' Niobe-Coteau buy area. The District Court found that these leases were purchased on the basis of information derived from a government bulletin and from courthouse records that disclosed where the major companies were purchasing. It stated that no evidence was presented to indicate the use of confidential Hunt data. The Hunts do not seriously challenge these findings. They are not clearly erroneous.

### 2. Sheep Butte, Johnson's Corner and N. W. Keene.

The Hunts had three buy areas in McKenzie County known as the Sheep Butte, Johnson's Corner and N.W. Keene areas. Again, the District Court found that there was no evidence to support the conclusion that the Ballantyne leases were wrongfully purchased. This finding is disputed by the Hunts only as to the leases from the Sheep Butte area.

Todd Ballantyne first worked for the Hunts in McKenzie County, and three of the logs he admittedly kept as souvenirs were from the Sheep Butte area. The Hunts stated without elaboration that this admitted possession of Hunt data should be sufficient to warrant the imposition of a constructive trust.

The three logs kept by Todd do not show the presence of commercial quantities of coal. They were of value only insofar as they disclosed where not to buy. But we cannot infer, in the absence of any additional evidence, that the possession of such a limited quantity of negative information could be a reasonable basis upon which to extrapolate where to buy valuable coal leas-

es. Further, Todd testified that these logs were given to and used by his father only for promotional purposes in the sale of the leases to Mobil Oil. As will be discussed in detail *infra,* Melvin was of the opinion that a "thick file" was needed to impress his prospective purchasers and to interest them into negotiation. The District Court's finding that the Ballantyne leases in this county were not purchased with the use of Hunt information is not clearly erroneous.

### 3. Dickinson.

The major portion of the Dickinson buy area is in Stark County with portions extending into Billings and Dunn Counties. The area is known for its rich coal reserves and was the scene of active leasing by many companies. The Ballantynes first purchased leases in the area in the spring and summer of 1973.

The only evidence tending to support the Hunts' allegation that the Ballantynes used Hunt information in these purchases is the fact that Todd kept eleven logs relating to this area and made interpretations of six others. Seven of the logs were from Stark County, although their exact locations were not shown on the face of the logs or known by Todd. The remaining four logs and the six attempted interpretations were from Dunn County near Melvin Ballantyne's farm. None of the logs showed commercial quantities of coal. For the reasons stated in the discussion of the Sheep Butte buy area, we cannot say that the District Court was clearly erroneous in finding against the Hunts.

### 4. New England—Regent and Elgin.

■ The New England—Regent and Elgin buy areas are in Hettinger County with the latter buy area extending into Grant County. The District Court found that the Ballantynes purchased coal leases in and near these areas principally because of the purchasing activities of companies other than the Hunts. Under the evidence presented, the fact that the Ballantyne leases were within the Hunt buy areas and between Hunt drill hole locations is merely coincidental. The coincidence alone is not clear and convincing proof of the use of Hunt information. The District Court's findings are not clearly erroneous.

### 5. Garrison.

The Garrison buy area as well as the Roseglen buy area are in McLean County. While the Ballantynes' method of purchasing for each area was put in issue below, the Hunts' challenge the District Court's factual findings only as they relate to the latter area. Whether the evidence warrants the imposition of a constructive trust over the Ballantyne leases near the Roseglen area will be discussed *infra.*

### 6. Sawyer-Velva.

■ The Ballantynes' largest block of coal leases, approximately 32,000 acres, was taken in and within approximately five miles of the Hunts' Sawyer-Velva buy area in Ward County. Many, if not most, of the Ballantyne leases were taken outside of the area that the Hunts considered commercially viable.

Melvin Ballantyne testified that the leases in this area were purchased on the basis of information derived from two publications of the federal government and from water well drilling information obtained from the state. The District Court found that this information did not outline a coal field but did provide a reasonable basis for Melvin to "guess" the location of coal. It found this method of decision making to be consistent with Melvin's mode of operation, and it further found the Ballantyne leasing pattern to be more consistent with the government data than with the Hunt buy area.

The Hunts do not seriously challenge these findings. They point to no positive evidence in the record, either of a direct or circumstantial nature, that supports the proposition that the Ballantynes used Hunt data in this area. Instead, they argue that because the Ballantynes would have used Hunt data if the opportunity to do so arose and because the information that the Ballantynes admittedly used was extremely

imprecise, the Ballantynes must have had Hunt data or they would not have purchased this large quantity of leases. We, like the District Court, do not consider argument to be clear and convincing proof. The District Court's findings are not clearly erroneous.

7. Tioga.

█ The Ballantyne leases for the Tioga area, located in Williams and Mountrail Counties, totaled more than 21,000 acres. The great majority of those leases, representing approximately 15,666 acres, were purchased after receipt of a letter from Richard Jodry of the Sun Oil Company that detailed the area's coal resources. The failure of the District Court to impose a constructive trust over these leases is not challenged.

The Hunts' attack on the District Court's ultimate finding of no liability is directed at the Ballantynes' early purchases, beginning in October, 1972, that encompass approximately 5,562 acres. The Ballantynes did not record these early leases until February, 1973.

The Ballantynes stated that these early leases were purchased because of the observed drilling activities of the Hunts and other companies, including notation of the cutting samples left on the ground, and from information acquired from conversations with the local farmers. The area was known for its oil reserves.

The Hunts would have us conclude, on the basis of a notation made by Charles Ballantyne on a list of observations, that the Ballantynes used Hunt data. The notation, which was made in apparent reference to a particular drill hole, was: "not numbered on map?". Charles could not remember the significance of the notation. The District Court was not willing to infer from the reference to a map that the Ballantynes possessed a Hunt map.

The early Ballantyne leases in the Tioga area that were purchased before the receipt of the Sun Oil information were also purchased before Todd started his employment with the Hunts. Todd, then, was not a

likely source from which the Ballantynes could acquire a Hunt map. Moreover, at the time in issue, the Hunts had not established a buy area map for the Tioga area. Finally, Reishus is not a likely source by which the Ballantynes could have acquired a Hunt map, for if that were the case, it is unlikely that the Ballantynes would have purchased those leases which are outside of the area of commercial coal. We agree with the District Court that the evidence does not warrant the inference that the Ballantynes had a Hunt map. Moreover, were we convinced to the contrary, there would be no basis upon which to further conclude that the Hunt map contained geophysical information. At the most, the map would have disclosed the location of drilling points and their assigned identification numbers. The Hunts have not alleged that the use of that information warrants the imposition of a constructive trust. *See* note 1, *supra*.

C.

The Ballantynes purchased coal leases in or near five Hunt buy areas yet to be discussed. The evidence of wrongful conduct in these areas centers on what has been termed the Frosaker maps and Abshire maps controversies. This evidence presents a closer question of whether the District Court erred in not finding liability.

1. Frosaker Maps.

The evidence relating to the Frosaker maps concerns the Ballantyne leases in or near the following Hunt buy areas: Windmill in Dunn County, Hanks-Grenora in Williams County and New Salem-Glen Ullin in Morton County. These maps are buy area maps made by Robert Frosaker. Of critical importance are the lines denoting the perimeter of the buy area referred to as the buy lines. The Hunts contend that the Frosaker maps represent the true Ballantyne buy areas, and that these buy areas were established with the use of Hunt confidential information. The contention is premised on the similarity between the buy lines on the Frosaker maps and the Hunt maps. The corollary to their contention is

that the Ballantyne buy area maps submitted into evidence, which were made from the information gathered by observing the drilling activities of other companies, from government publication and from the courthouse records of other companies' coal leases, are fraudulent.

Robert Frosaker was a landman. He was employed by the Ballantynes from February, 1973, to the fall of 1973 and was paid by a commission on the acres he leased. From the fall of 1973 to early 1974, he was employed by Mobil Oil, and from early 1974 to October, 1974, he was employed by J. R. Sweeney, a lease holder from Chicago, Illinois. Frosaker's leasing activities for Mobil Oil were limited to Ward County, and his buy area maps for that area are not in issue. Frosaker's leasing activities for Sweeney are in issue.

■ Sweeney purchased coal leases in the same manner as the Ballantynes, by following the lead of the major companies. He engaged the Ballantyne landmen because he found that local people had greater success in securing coal leases. Approximately eighty percent of Sweeney's leases were purchased by Frosaker. These leases were taken in Williams and Dunn Counties. Thus, while Frosaker received all of his directions from the Ballantynes, the latter were merely conduits between he and Sweeney. Sweeney's purchasing decisions were made independently of the Ballantynes. The evidence supports the conclusion of the District Court:

> The fact that the maps were used by Frosaker while buying leases for three different employers[2] over an extended period of time, and revised as his leasing operations progressed, destroyed their probative value in the effort to determine the buylines, if any, that were furnished him by the Pan American operation.

Frosaker did not know the source of the information upon which the Ballantynes relied in directing his purchases.

■ The Hunts, however, ask us to review the evidence with more specificity,

distinguishing between those areas where Frosaker purchased for both the Ballantynes and Sweeney and those areas where he purchased only for the former. Also, they ask us to reject the conclusion that Sweeney influenced the development of the Frosaker maps. They base this request on the similarity between the buy lines coupled with the fact that Todd, or Reishus, had the opportunity to acquire and pass to the Ballantynes the Hunt buy maps.

#### a. Windmill.

Frosaker purchased coal leases in the Windmill area of Dunn County for the Ballantynes and Sweeney. The final perimeter for this buy area was established by the Hunts in January, 1973. The Ballantynes first leased in this area in April, 1973. The Hunts' contention that the Ballantynes used their confidential information rests solely on the fact that the northern half of Frosaker's map includes, within its buy area, the pre-January, 1973, Hunt buy area. The southern half of the Frosaker map is not similar to the Hunt buy area.

The Hunts ignore the fact that the Ballantyne leases within the northern half of the Frosaker buy area are also near coal leases of the Wilhite Company. Frosaker's directions, reflected on his map, are consistent with the purchasing methods of the Ballantynes. These leases are also consistent with the buy area maps introduced by the Ballantynes. Moreover, additional facts are inconsistent with the Hunts' contention. If the Ballantynes had the Hunt map, it is less likely that they would have purchased the leases that are outside of the Hunt buy area and unlikely that they would have let options to purchase additional leases that were within the Hunt buy area lapse. We cannot say that the District Court was clearly erroneous.

#### b. Hanks-Grenora.

The Hunts established their buy area for Hanks-Grenora in the summer of 1972. The Ballantynes first purchased leases in

---

**2.** We agree with the Hunts that Mobil Oil had no influence on the development of the Frosaker maps at issue. The maps reflected the directives of the Ballantynes and Sweeney.

this area in January, 1973. In total, nine leases were purchased. The Ballantyne leases were within their buy area and the buy area shown by the Frosaker maps. They were outside of the Hunt buy area.

The Hunts contend, nevertheless, that the Ballantynes had their information because the Frosaker buy line is similar to the buy line on the Hunt map. The similarity prevails if the Frosaker buy line is moved three sections to the west. The District Court found this three-section error to be fatal to the Hunts' contention. We agree.

Within the Hunt buy area is the town of Hanks, a likely and easily identifiable landmark for anyone who would have traced the Hunt buy area map. It is not reasonable to assume, then, that the Frosaker map is in fact the Hunt map erroneously copied. The record before us does not support the Hunts' statement that the error could have occurred because its buy maps did not show towns. The contrary is true.

The Hunts point to a further similarity to support their claim. The Frosaker and Hunt buy lines break and then continue at approximately the same place in the southwestern portion of the buy area. Of course, the Frosaker map shows the break to be three sections to the east and it is approximately one-half section to the north. But the similarity is significant because the break in the Hunt buy line reflects adverse topographical features of the land. The topography, the Hunts claim, could only have been known by the Ballantynes through wrongful possession of their information.[3]

Frosaker, pursuant to instruction, excluded from his areas of purchase buttes and

river beds or other obvious topographical features that would render a lease valueless. Such adverse topography could be observed visually by one working the area and noted on a map. The Ballantynes assert that this explains the break in Frosaker's buy line.

The Ballantynes' explanation is, on its face, reasonable. Perhaps under North Dakota law this is sufficient to conclude that the clear and convincing standard of proof has not been met. See Scheid v. Scheid, supra at 840. We are, however, uneasy with that conclusion because the testimony of Frosaker's practice of noting topographical features was general and not specifically related to his Hanks-Grenora buy line. On the other hand, the Hunts did not offer any evidence to show that the break in Frosaker's buy line could not have been the result of the topography of the area of the break. Because of the three-section error and because we cannot accept the corollary to the Hunts' contention that the Ballantyne buy area maps are fraudulent, see infra, we must conclude that the District Court was not clearly erroneous in finding that the Ballantynes did not have confidential Hunt information for the Hanks-Grenora area.[4]

c. New Salem-Glen Ullin.

The New Salem-Glen Ullin buy area for Morton County was established by the Hunts in early 1972. The Ballantynes first purchased coal leases in the area in 1973. New Salem-Glen Ullin was an area of heavy Hunt activity which made it relatively easy, by checking the courthouse records of the recorded leases, to define the Hunt buy area.

---

**3.** The Ballantynes did introduce a topographical map of the area. But the Ballantynes did not reflect the topography in their buy area maps, and there is no evidence that Frosaker relied on the topographical map.

**4.** The District Court further relied upon the fact that Frosaker's map could have reflected the purchasing decisions of Sweeney as well as the Ballantynes. Sweeney did purchase in Williams County and Frosaker was his principal landman. Moreover, because Frosaker was not aware of the source of the Ballantyne directives, he could have been mistaken in his belief that he purchased solely for the Ballantynes in Williams County. Accordingly, it could not be said with equal force that the Frosaker map reflected Hunt confidential information filtered through the Ballantynes. This is a reasonable theory under the evidence. But we find it significant that Frosaker's maps for Williams County were not, in contrast to his Dunn County maps, objected to under this theory.

Frosaker worked only for the Ballantynes in Morton County. While his maps do not show a complete buy area, they do outline portions of a buy area that is similar to an early Hunt buy area. The Hunts contracted their buy area, after purchasing leases in the omitted portion, in February or March, 1973. The Ballantyne purchases that are within the Frosaker buy area later omitted by the Hunts were made after the Hunts had leased in the area. No adverse inferences arise from the fact that the Ballantynes followed the Hunts' leasing activity.

The Hunts also rely on the following notations made in reference to particular leases on the Ballantynes' business records, "didn't pay-out of area;" and "Frosaker said Todd. approved this lease OUT of Area." The notations referred to leases secured by Frosaker in June, 1973. Todd was not then a Hunt employee. They are considered important because the leases were not outside of the Ballantyne buy area; they were outside of the Hunt buy area. The inference arises, the Hunts contend, that the Ballantynes were leasing from Hunt buy maps.

Frosaker, as but one of the Ballantyne landmen, was not assigned an entire buy area in which to secure leases. This is consistent with the fragmentary nature of his buy line for Morton County and with the fact that the Ballantyne buy maps showed a larger target area than the Frosaker maps. It is also consistent with the explanation .offered for the notations. They referred to a failure to pay Frosaker his commission for leases secured in another landman's area. A similar notation, "Out of Area," was made on the same business record for a lease secured by Frosaker that was within the Ballantyne buy area, as well as the Hunt buy area. Moreover, it is not reasonable to assume that Todd would have approved the purchase of leases that are outside of the Hunt buy area if the Ballantynes had the Hunt maps.

Hunts' contention that the Frosaker maps evince the use by the Ballantynes of Hunt buy maps puts them in the position of arguing the corollary: the Ballantyne buy maps put into evidence are frauds. The District Court could not accept that proposition.

The Hunts filed their complaint on October 17, 1973. On October 19, 1973, an order issued requiring the Ballantynes to deposit with the court by October 23, 1973, *inter alia,* all of their maps pertaining to coal properties located in the State of North Dakota. Service was by mail. Among the mass of documents deposited with the court were the Ballantyne buy maps; maps which noted, in addition to the outlined buy area, the leasing activities of other companies. We, like the District Court, do not believe the Ballantynes could have fabricated these maps in the time allowed.

Moreover, we are not convinced that acceptance of the authenticity of both the Ballantyne buy maps and the Frosaker maps is inconsistent under the evidence. The Hunts urge us to conclude to the contrary because, in their view, the Frosaker buy lines are, like the Hunt buy lines, geological in nature. No reference is made to the record to support their opinion. We are left to make a visual comparison for similarity.

The perimeter, or buy line, of the Ballantyne buy areas follows the section lines. The buy lines on the Hunt maps, in contrast, twist and turn sharply in accordance with the geophysical data compiled for each area. The Frosaker buy lines are dissimilar from both. They do not present the simple outline of the Ballantyne maps nor the sophisticated outline of the Hunt maps. Frosaker's buy lines, instead, reflect the method of their preparation. They are a composite of many separate maps prepared over a number of months by a man assigned to purchase leases in specific areas after excluding therefrom obvious areas of adverse topography. The findings of the District Court are not clearly erroneous.

2. Abshire Maps.

█ The evidence relating to the Abshire maps affects the Ballantyne leases in the Windmill and Deep Creek areas of Dunn County and the Roseglen area of

McLean County. The maps were prepared by Bruce Abshire, a consulting geologist for Mobil Oil in August, 1973. They record the locations and identification numbers of the logs given to Mobil Oil by the Ballantynes. In addition, they note a cursory interpretation of the logs. The Hunts contend that the data recorded on the Abshire maps is so similar to the data contained on their logs that Abshire must have been plotting Hunt logs. Proof of the contention supports the additional inference that the Ballantynes possessed these Hunt logs for the purpose of intelligently purchasing coal leases. Abshire plotted over one hundred logs.

The Ballantynes admit that the information recorded on the Abshire maps, the locations and identification numbers, is Hunt information. They further admit that the information was retained by Todd from his employment with the Hunts. They do not admit that Abshire had Hunt logs. Instead, they contend that Abshire plotted logs that were manufactured by Todd and his sister in the summer of 1973. These manufactured logs, which were introduced into evidence, have been referred to as the bogus logs. They were made as a sales technique to allow Melvin Ballantyne to present a "thick file" to prospective purchasers and thereby interest them into negotiation. To make the bogus logs appear as authentic as possible, they were given a Hunt location and identification number. Thus, if the logs were checked in the field, there would be evidence of a drill hole. The locations and identification numbers came, the Ballantynes contend, from what has been termed Todd's memory sheets. These memory sheets were prepared by Todd during his employment with the Hunts. On them, he recorded where he was to log each day and where other crews were drilling and logging. They were made, Todd testified, to aid him in the performance of his duties for the Hunts. In addition, some of the bogus logs were given locations derived from visual observations in the field.

The memory sheets were not introduced into evidence. Todd testified that he could not find them among his records. How-

ever, their existence in fact is consistent with other evidence introduced at trial. Todd worked for the Hunts in Dunn County on November 15, 17, 19–21, 1972. All of the locations noted on Abshire's map for that county were drilled prior to those dates. Thus, Todd had access, from the area map given each logger, to the locations and identification numbers noted by Abshire. In McLean County, Todd was asked to core the locations noted by Abshire. Although this coring was eventually done by Reishus, Todd stated that he kept the list of locations where the work was to be done.

Resolution of the Abshire map controversy turns upon the source of the information recorded by Abshire. We examine the evidence as it relates to each county separately.

a.  Dunn County.

The Abshire map plotted one hundred and twelve locations. Of those, one hundred and two locations correspond to Hunt drill holes. This information could have been taken from the face of the hunt logs or from the face of the bogus logs. Todd's memory sheets recorded the locations of the drill holes for the Windmill and Deep Creek buy areas of Dunn County. Thus, while the correlation of the Abshire locations and the Hunt locations is high, it does not support the contention that Abshire had Hunt logs. The Ballantynes argue that the ten Abshire locations that do not correspond to Hunt drill holes supports their contention. These locations, they assert, relate to drill holes observed visually and attributed to the bogus logs. Absent a plotting error by Abshire, the inference is that he did not have Hunt logs.

The identification numbers noted by Abshire correspond exactly to the numerical portion of the identification numbers placed on the Hunt logs in the field by each logger. The alphabetical prefix used by the Hunts was not noted on the Abshire map. Abshire refused to speculate, as suggested by the questioning of Hunt counsel, that he omitted prefix letters for convenience, it being repetitious to put the same letter

before each number. Nevertheless, the Hunts contend that this is conclusive proof of their contention that Abshire was given Hunt logs by the Ballantynes.[5]

The Hunt identification numbers were noted on the face of their logs. These numbers were, in some instances, changed at the Dallas offices because of duplications in the field. Thus, if Abshire plotted copies of Hunt logs, those copies must have been made before the originals were sent from North Dakota to the home office. As stated, *supra,* the opportunity to acquire copies of the Hunts' logs was limited. Moreover, only twenty-seven of the logs noted by Abshire were taken by Todd.[6] This limited opportunity does not, of course, foreclose the possibility of wrongdoing. But it does render more likely the Ballantynes' explanation that Abshire had bogus logs that were assigned Hunt identification numbers from Todd's memory sheets.

But, the bogus logs showed only locations; they did not have on their face identification numbers. Thus, Abshire could have recorded this information only from the Hunt logs or the supplemental sheets which Abshire stated were included with the bogus logs. He identified the supplemental sheets as few in number and handwritten but could not recall what information they contained. The supplemental sheets were not introduced into evidence. Of critical importance then is the procedures employed by Abshire in making his maps and the contents of Todd's memory sheets from which Abshire's supplemental sheets were made.

Abshire's testimony was guarded. At one point, he stated that he found the information recorded on his maps on the face of the logs and in the supplemental sheets. But, at other points, he was more specific, stating that he took the identification numbers from the face of the logs. The supplemental sheets were used only as a cross-reference to the information contained on the logs. Since the supplemental sheets were a cross-reference, we logically assume, although the argument was not made by the parties, that they contained identification numbers as well as locations. Nevertheless, Abshire's testimony must be read as stating that, at least as to some logs, the identification numbers were taken from the face of the logs.[7]

Moreover, while Todd had access to both the locations and identification numbers of the Hunt drill holes plotted on the Abshire map, he stated clearly that his memory sheets contained only location data. Only Melvin Ballantyne stated that the memory sheets contained identification numbers. But his testimony was equivocal. Indeed, at one point in the record, he stated that he had never seen Todd's memory sheets.

Were this the only evidence on the issue, we would conclude that the District Court was clearly erroneous. Abshire recorded the identification numbers that were taken, at least in part, from the face of the logs. That information was not retained by Todd on his memory sheets and was not on the face of the bogus logs. Abshire must have been recording that information from Hunt

---

**5.** The identification numbers placed on the Hunt logs in the field were sequential, except for a gap between numbers forty-five and fifty-one. The Abshire map also showed no logs numbered forty-six through fifty. This correlation could be because Abshire was plotting Hunt logs or because he was given this information from Todd's memory sheets. It is proof that the Ballantynes did not simply assign the bogus logs identification numbers of their own creation.

**6.** As stated previously, the evidence does not implicate Mark Reishus in the alleged wrongdoing of the Ballantynes. A contrary conclu-

sion is inconsistent with the numerous Ballantyne leases taken outside of the areas of commercial coal and with the fact that in many cases there was a substantial time lag between the Hunts' entry into an area and the first leases taken by the Ballantynes.

**7.** Abshire's testimony was not forceful. At one point, he stated:

Nor do I necessarily know that that's—I assume that that was on the log because I have it here as part of a code number for that log. That's the only assumption that I can draw at this time.

logs.[8] But this is not the only evidence on the issue.

In addition to the ten locations plotted by Abshire that did not correspond to the location of Hunt drill holes, there were twenty locations plotted by Abshire at which the Hunts drilled a hole but did not log. For these locations, the Hunts placed a blank log in their file. But Abshire could not recall plotting blank logs which, if he had Hunt logs, would have constituted approximately eighteen percent of all the logs plotted. The reasonable inference from this evidence is that Abshire did not have Hunt logs.

Also, Abshire considered the logs before him to be of poor technical quality. The bogus logs indisputably fall within that characterization. The Hunt logs, by contrast, were of high quality.

The Hunts attempt to minimize the force of this evidence by arguing that Abshire's characterization of the logs before him was premised on a false assumption. Abshire believed that he had density logs; the Hunts made gammaray logs; accordingly, Abshire could have had Hunt logs and still believed them to be of poor quality because he did not realize the type of log he had. We reject this argument. Abshire's characterization related to the technique or skill displayed in the recording of the information shown on the logs. It did not relate to the type of information recorded. This was corroborated by the testimony of Zimmerman, a Hunt geologist. He stated that the bogus logs evinced the poor operation of the logging machine and that a logger who consistently produced such logs would be fired. Again, we must infer from this evidence that Abshire did not have Hunt logs.

Abshire also noted on his maps those locations at which the log indicated at least a ten-foot intercept of coal. Operating under his original assumptions as to the type of log before him, he was asked to interpret two corresponding Hunt logs. He failed to make the same interpretation as to one of those logs. While the number of comparisons was small, it is reasonable to assume that Abshire would have made the same interpretation in both cases if the logs he plotted originally were Hunt logs. Because the sample was so small, however, we can accord this evidence little weight.[9]

Finally, it is significant that the Ballantynes let options to purchase leases in areas near the locations noted on Abshire's map lapse. Under the Hunts' contention that over one hundred of their logs were possessed by the Ballantynes, we must assume that the latter acquired them for the purpose of intelligently purchasing coal leases. But if the information extracted from those logs showed no commercial coal, it is unreasonable for the Ballantynes to have purchased the options to lease. Contrariwise,

8. The District Court's analysis of the source of the identification numbers recorded by Abshire, referred to below as well numbers, is self-defeating. It said:

> There is evidence before the Court that certain "supplemental material," in the form of Todd's memory pads, was also given to Mobil which did carry shotpoint *locations,* by section, range and township of the drill holes. While Abshire recalled that "the logs contained in addition to the graph portion, well number and location" (indicating figures on the logs themselves, he also responded in the following manner:
> "Was there any other information that you used in constructing the work you did on this map other than logs?"
>
>     *    *    *    *    *    *
>
> "As I recall, there were a few sheets. I can't give you an exact number of supplemental *location* data." (Emphasis supplied.)

By the District Court's analysis, the identification numbers could not have been taken from the supplemental sheets.

9. The Hunts contend that the fact that Abshire interpreted the logs before him is evidence that he had Hunt logs. The contention is premised on the opinion that the bogus logs were not interpretable because they did not designate the scale by which to measure the recorded information. It is clear that the bogus logs could not be interpreted with certainty. But Abshire's purpose in plotting the logs did not require definiteness.

Todd testified that he made the bogus logs to appear as authentic as possible. To that end, he proceeded under the assumption that each hash mark on the graph paper represented two feet. This is the same scale that is used on the Hunt logs. Accordingly, Abshire could interpret the bogus logs if he assumed the scale.

if the logs showed commercial coal, or if a positive decision could be extrapolated from them, it is unreasonable for the Ballantynes to have let the options lapse. The Ballantynes did not act consistently with the contention that they possessed Hunt logs. Moreover, while the Hunts first purchased in the Windmill area in February, 1973, the Ballantynes did not secure their first lease in that area until April, 1973. Most of their leases were purchased in July and August of that year. In the Deep Creek area, the Hunts first purchased in July, 1972; the Ballantynes first purchased in February, 1973. The possession by the Ballantynes of geophysical data is inconsistent with their delay in securing leases. The delay in securing leases is consistent with the Ballantynes' stated method of purchasing.

The evidence is conflicting. It both supports and refutes the contention that the Ballantynes possessed Hunt logs. Were we the triers of fact, perhaps we would have struck the balance differently and found for the Hunts. But, they carried a heavy evidentiary burden below and our review is limited by the clearly erroneous standard. We are not firmly convinced that the factual findings of the District Court are erroneous.

b. McLean County.

Abshire plotted eight logs in the heart of the Hunt Roseglen buy area in McLean County. The locations and identification numbers recorded by Abshire correspond exactly with Hunt logs; logs which were probably returned to North Dakota from Dallas for coring purposes.

Again, Todd's testimony explains the possession of the location information. He did not, however, admit to retaining the identification numbers. From this evidence alone, we would find for the Hunts.

But the Ballantynes' purchasing decisions are not consistent with the possession of Hunt logs. None of their leases were in the heart of the Roseglen area. Indeed, most were outside of the buy area completely. Moreover, the Ballantynes' first leases were taken more than a year after the Hunts

initiated their leasing program in the area. The Ballantynes followed the lead of the Hunts; they did not act independently as would be expected if they possessed geophysical data. Again, we cannot say that the District Court was clearly erroneous.

The order and judgment of the District Court is affirmed.