**Enrico SOCCODATO, Appellant,**

v.

**John Foster DULLES, Secretary of State, Appellee.**

**No. 12108.**

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 14, 1955.

Decided June 30, 1955.

Petition for Rehearing In Banc Denied
Oct. 4, 1955.

Prettyman, Circuit Judge, dissented.

Mr. Domenic Tesauro, Washington, D. C., for appellant.

Miss Catherine B. Kelly, Asst. U. S. Atty., with whom Messrs. Leo A. Rover, U. S. Atty., and Lewis Carroll and Robert L. Toomey, Asst. U. S. Attys., were on the brief, for appellee.

Before PRETTYMAN, WILBUR K. MILLER, and FAHY, Circuit Judges.

FAHY, Circuit Judge.

The District Court, in an action by appellant for a judgment declaring him to be a citizen of the United States, held that he had expatriated himself and was no longer a citizen. He was born in the United States October 6, 1914, and thus became a citizen under our Constitution and laws. Perkins v. Elg, 307 U.S. 325, 328–329, 59 S.Ct. 884, 83 L.Ed. 1320. His parents were nationals of Italy and so he was also a citizen of Italy under the laws of that country. He was taken to Italy by his parents in 1920 when he was six years old. He apparently returned

to this country in 1952 or 1953 in the effort to establish his status as a citizen.

The District Court held appellant had expatriated himself by voluntary service in the Italian army, voluntarily taking an oath of allegiance to the King of Italy, and voluntary participation in the Italian political elections of 1946 and 1948.

■ 1. While still a minor he took an oath of allegiance[1] to the King of Italy in July, 1935, after entering the Italian army in April of that year. He was discharged the following December. The Secretary of State concedes that one who takes such an oath during minority does not thereby lose his American citizenship. And no law effective in 1935 made service in a foreign army even during majority an expatriating act. The Government's position is that appellant's subsequent army service in 1940-1946, and his voting in post-war political elections, confirmed the 1935 oath with like effect as though taken during majority. The statute does not so provide, and we cannot read this into the law. See Pandolfo v. Acheson, 2 Cir., 202 F.2d 38, 41, and Di Girolamo v. Acheson, D.C.D.C., 101 F.Supp. 380, 382, the latter holding that in the absence of a showing of intent to relinquish American citizenship military service after attaining majority is not to be considered as confirmation of the taking of an oath of allegiance during minority.

2. Appellant re-entered the Italian army September 23, 1940. Though then of age he did not take another oath of allegiance to the King, and army service alone did not become a ground of expatriation until January 13, 1941.[2] The question is whether his remaining in the service from January 13, 1941, until June 5, 1946, brought about his expatriation. If entering the service was involuntary his continuing therein ordinarily would seem no less so; but we must examine more fully the circumstances. Appellant testified he entered the army in September, 1940, in response to a general call "that even without personal notice to each individual draftee, everybody was supposed to appear and report for duty." He was a reservist and there is evidence that under the laws of Italy the call obliged him to serve. Army service in Italy under conditions then existing has been held to have been under legal compulsion. See Acheson v. Maenza, 92 U.S.App.D.C. 85, 90-91, 202 F.2d 453, 458-459, and Alata v. Dulles, 95 U.S.App.D.C. 182, 221 F.2d 52, with its reference to Mandoli v. Acheson, 344 U.S. 133, 73 S.Ct. 135, 97 L.Ed. 146. While each case must stand upon its own facts, there are some circumstances more favorable to appellant than were present in Alata's case. Within a few weeks after the Nationality Act of 1940 became effective, appellant, on February 5, 1941, became a prisoner and so remained until March 30, 1946. On April 5, 1946, he was given special leave for 60 days and at its conclusion was discharged June 5, 1946.[3] His failure while a prisoner to seek release from the army cannot without more be held to have rendered voluntary his service during that period. When he was given special leave April 5, 1946, there was no longer any practical reason to seek release since he was to be discharged at the end of the leave. Thus it appears that except for the time he

---

[1]. Section 2 of the Nationality Act of 1907, 34 Stat. 1228, provides "That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state."

[2]. § 401(c) of the Nationality Act of 1940, 54 Stat. 1137, 1169, makes the unauthorized service in a foreign army by one who has or acquires foreign nationality an expatriating act. But § 601 of the same Act provides: "This Act shall take effect from and after ninety days from the date of its approval." The Act was "Approved, October 14, 1940."

[3]. Appellant himself testified that he served "[f]rom December 6, 1940 to March 30, 1946, when I returned home." His army matricular record, however, shows the special leave beginning April 5, 1946, and his unlimited discharge June 5.

was a prisoner and that spent on special leave appellant's period of actual military service after the 1940 Act became effective was only a few weeks in 1941 and a few days in 1946. His failure in these two short intervals to seek release from the army did not cause a loss of citizenship.

The Government, however, points to evidence of personal reasons of appellant for re-entering the army in September, 1940, as indicative of the voluntary character of his service. Thus, in his affidavit given the American Vice Consul at Naples May 19, 1952, he said that before he was recalled on September 23, 1940, he had asked to join because he was unemployed and had no way to support his wife and four children. But the fact is he was recalled under circumstances which placed legal pressure upon him to respond. His motives for desiring to re-enter the army do not alter the compulsive nature of the call.

█ We conclude that his service involuntarily begun did not change its character by his failure to prove affirmative efforts to obtain release during (a) the few weeks of active service after the Act became effective and before his capture, and (b) the few days of service four years later before his leave preceding discharge. See Perri v. Dulles, 3 Cir., 206 F.2d 586, 589.[4]

3. There remains for consideration the effect of appellant's voting. Section 401(e) of the Nationality Act of 1940, 54 Stat. 1137, 1169, provides for loss of American citizenship by "[v]oting in a political election in a foreign state * * *." Part of the evidence on this subject is appellant's affidavit before the American Vice Consul at Naples May 19, 1952, in which he says he voted in 1948 "because of all the electoral propaganda and what they were saying around", that he did not know it would compromise his American citizenship, and he desired to give his contribution against Communism. At the trial he stated that he voted only in 1946 and that the affidavit to the Vice Consul giving the time of voting as 1948, as well as 1946, is a mistake. Furthermore, the statements in the affidavit must be considered with his testimony at the trial that he voted because if he did not do so he would lose his civil rights, his "certificate of good behavior would have been disqualified and I do not find any more job", that his relatives and immediate family would have been deprived of their ration card, that the Parish priest urged him to vote, and that the law forced him to do so. When asked why he did not tell the Vice Consul that he was compelled to vote he replied that the Consul knew it was an obligation to vote in Italy. He

---

4. In Perri v. Dulles, supra, the court said:
"* * * Since the plaintiff's entry into the Italian army took place long before January 13, 1941, the effective date of the Nationality Act of 1940, that Act cannot apply to his entry into or service in the armed forces of Italy prior to that date. We, therefore, need not consider the plaintiff's contention that the district court erred in finding that his original entry into the Italian forces was voluntary.

"On January 13, 1941, however, the plaintiff, who then had Italian citizenship, was serving actively in the Italian armed forces. The real question at this point, therefore, is whether the plaintiff's military service from and after January 13, 1941 was voluntary in the sense that he could have secured release from it under the laws of Italy but did not do so.

Otherwise it was necessarily involuntary, however it may have originated. The plaintiff proved that he was drafted into the Italian army at the age of 19 years and that all his subsequent service was under this original draft. We think that this was sufficient to establish prima facie that his service on and after January 13, 1941 was involuntary. This would, of course, be subject to rebuttal by evidence that on or after that date Italian law or military practice would have permitted the plaintiff to secure release, on the ground of his United States citizenship or otherwise. On remand the defendant will have an opportunity to present such evidence. On the present record, however, we cannot hold that expatriation by continued voluntary military service after January 13, 1941 has been established." 206 F.2d at page 589.

added that he had gone alone to the Consul's office without a lawyer and the statement he signed was not re-read to him.[5]

His testimony is buttressed partially by a lawyer who had been admitted to the bar in Italy and who testified that Italian law required appellant as an Italian citizen to vote as a matter of duty, and that when appellant entered military service all citizens whether born in the Kingdom or abroad were compelled to serve in the Italian army unless they could prove they had already served in the armed forces of the country of their birth. Another witness testified that during the war if one refused to be drafted he would be arrested, and if one did not vote in the national election of 1946 he would be punished with sanctions such as a fine and loss of his food ration cards.

We note at this point that the May, 1952, affidavit before the Vice Consul is not the handiwork of appellant, who testified at the trial through an interpreter, but appears to have been composed by the Consular official on the basis of appellant's answers to various questions. Its composition indicates that the questions were not designed to elicit an exposition of the situation which confronted appellant regarding either his military service or voting. And except as the affidavit does so, the Government made no attempt to rebut appellant's testimony as to the pressures upon him.[6]

We conclude that appellant's military service after January 13, 1941, and his voting, should not be held to have brought about the loss of his American citizenship. As previously shown, **no** other conduct on his part did so.

In reaching this decision we have considered our obligation under Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A., not to set aside the findings of the District Court unless clearly erroneous, giving due regard to the opportunity of the trial court to judge of the credibility of the witnesses. In expatriation cases, however, another rule also applies. As we stated in Alata v. Dulles, supra, factual doubts are to be resolved in favor of citizenship. We cited Acheson v. Maenza, 92 U.S.App. D.C. at page 88, 202 F.2d at page 456, where our court likened the situation to denaturalization cases, in which the Government has always been held to a strict degree of proof, usually being required to prove its case by clear, unequivocal and convincing evidence, not by a bare preponderance "which leaves the issue in doubt," citing Baumgartner v. United States, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525 and Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L. Ed. 1796.[7] We now add a reference to Monaco v. Dulles, 2 Cir., 210 F.2d 760, 762, in which the court explicitly agreed with Acheson v. Maenza, to the effect that the burden in an expatriation case is like that in a denaturalization proceeding, i. e., the evidence of expatriation must be "clear, unequivocal and convincing". Without express reference to Rule 52(a) the Court of Appeals for the Second Circuit in Monaco v. Dulles reversed the trial court.[8] In Augello v. Dulles, 2 Cir., 220 F.2d 344, the same Court of Appeals repeated that expatria-

---

5. When asked why he did not read the statement he said: "They just put a pencil mark at the spot where I was to sign. And I thought they were the papers authorizing me to come back to the United States. So I just signed in the different places."

6. Another affidavit of appellant dated October 8, 1947, made before an American Vice Consul at Naples, and appellant's matricular record, were also in evidence. These documents contain considerable factual material about his family and activities, including dates of his service in the Italian army, but, except as their contents have been referred to in the body of the opinion, contain no information which affects the conclusion we reach.

7. In Alata we also cited several other cases in which the opinions appear to bear out our view regarding the resolution of factual doubts.

8. The Government's evidence, however, was documentary, so that one of the reasons underlying Rule 52(a) was absent.

tion of American citizenship must be proved by evidence that is clear, unequivocal and convincing. Again without mention of Rule 52(a) the trial court was reversed although it had found that Augello not only had taken an oath of allegiance to the King of Italy but had done so voluntarily. The appellate court held that the presumption of voluntariness may be rebutted by proof that the oath was taken as an incident of compulsory military service, citing Perri v. Dulles, supra, as well as Mandoli v. Acheson, supra.[9]

Whether stated in terms of resolving factual doubts in favor of citizenship, as in Alata v. Dulles,[10] or in terms of the necessity of proving expatriation by clear, unequivocal and convincing evidence, as in Monaco v. Dulles, we must keep these criteria in mind when reviewing findings of a trial judge in expatriation cases. As said in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, a finding is clearly erroneous within the meaning of Rule 52(a) when, although there is evidence to support it, the reviewing court on the entire evidence "is left with the definite and firm conviction that a mistake has been committed." [11] Guided by the criteria referred to, considered with this interpretation of "clearly erroneous", we have such a conviction in this case, and accordingly are impelled to set aside the conclusion reached by the learned trial judge, the more so because of uncertainty that the criteria set forth were known to apply in this jurisdiction when the case was before him.

Reversed and remanded for further proceedings consistent with this opinion.

PRETTYMAN, Circuit Judge (dissenting).

This decision of the court is another long step in a progression of court decisions away from the terms of the applicable statutes. I think that step ought not to be taken.

We start consideration with the statutes themselves. Two are involved, one of 1907 and the other of 1940.[1] They are quite simple and unqualified. The 1907 Act provided:

"Sec. 2. That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state."

That statute obtained until January 13, 1941, the effective date of the 1940 Act. The latter Act provided:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

\* \* \* \* \* \*

"(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or

9. The court added that the inference of duress from conscription was doubtless also subject to rebuttal, through evidence that once conscripted the soldier volunteered for service more onerous than that mandatorily imposed upon a conscript or through evidence that Italian law permitted him to invoke his American citizenship as ground for immunity from service but he failed to do so.

10. As our opinion in that case concludes, the doubt as to the voluntary character

of the expatriating conduct must be a substantial one. 95 U.S.App.D.C. at page 186, 221 F.2d at page 56.

11. Compare, however, Fook v. Brownell, 9 Cir., 218 F.2d 924.

1. The 1907 Act is at 34 Stat. 1228. The 1940 statute is Section 401 of an Act of Oct. 14, 1940, 54 Stat. 1168, which was codified as 8 U.S.C. § 801. This section was superseded by an Act of June 27, 1952, 66 Stat. 267, and is now codified as 8 U.S.C. § 1481(a).

acquires the nationality of such foreign state; or

* \ * * * * *

"(e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory; or * * * "

Both of these Acts are quite direct. The 1907 Act says that an American citizen "shall be deemed to have expatriated himself" when he takes an oath of allegiance to a foreign state. The 1940 Act says a national of the United States "shall lose his nationality" by doing the specified acts. There are no qualifications in the provisions.

The courts have held [2] that the acts of expatriation specified in the statutes must be voluntary. That was one step away from the terms of the statutes. Of course an act performed under actual duress would be deemed to be of no effect, but the doctrine that the act must be "voluntary" was a broader concept and has been so regarded. It seems to me, as I read the cases, that there is a tendency to expand the term "voluntary" so as to make it mean specifically intentioned; that, to be effectively expatriating, not only must an act be voluntary in the ordinary meaning of that term but the person doing the act must specifically intend to relinquish his American citizenship thereby. It is true that in several opinions, including two of the Supreme Court [3] and two of this court,[4] it has been said that intention is immaterial in these cases. But in Alata,[5] for example, the court discussed in some detail the applicant's "own intention and state

of mind" and concluded that the oath-taking there "was not such a voluntary *or willful* act of *renunciation* of American citizenship as the statute or decisions require to effect its loss." (Emphasis mine.) The extreme breadth evidently applied to the term "voluntary" in reaching the decisions in some cases seems to me to indicate this tendency. Under such an extended meaning of the word "voluntary", if a person were to perform an act for expediency's sake but not mean thereby to give up American citizenship, the act would not be "voluntary". This is indeed a long step from the statutes.

The courts have held that acts done prior to age twenty-one are not to be considered as expatriating. The 1940 statute specified as an act of expatriation "entering" the armed forces of a foreign state, and Congress must have known that men eighteen years old are liable to military service in many countries, as they are in this one. Then courts have held that the voluntary nature of an alleged act of expatriation is part of the burden of proof on the Government and that its proof must be clear, unequivocal and convincing.[6] Some courts have declined to take this latter step and hold that when the act of expatriation, as specified in the statute, is proved, the burden of going forward to show its involuntary nature is thereafter upon the individual.[7] This court has held in this connection that proof of the involuntary nature of an expatriating act is upon the individual, but at the same time it held that, when reasonable inferences from the evidence create substantial doubt of the voluntariness of the act, this burden is met. In other words the rule here is

2. The cases to which reference is made in this opinion are cited in the court's opinion and need not be discussed in detail here.

3. Mackenzie v. Hare, 1915, 239 U.S. 299, 36 S.Ct. 106, 60 L.Ed. 297; Savorgnan v. United States, 1950, 338 U.S. 491, 70 S.Ct. 292, 94 L.Ed. 287.

4. Acheson v. Wohlmuth, 1952, 90 U.S. App.D.C. 375, 196 F.2d 866, certiorari denied, 1952, 344 U.S. 833, 73 S.Ct. 40,

97 L.Ed. 648; Bisceglia v. Acheson, 1952, 91 U.S.App.D.C. 1, 196 F.2d 865.

5. Alata v. Dulles, D.C.Cir.1955, 95 U.S. App.D.C. 182, 221 F.2d 52.

6. Bauer v. Clark, 7 Cir., 1947, 161 F.2d 397, certiorari denied, 1947, 332 U.S. 839, 68 S.Ct. 210, 92 L.Ed. 411; Lehmann v. Acheson, 3 Cir., 1953, 206 F.2d 592.

7. E. g., Pandolfo v. Acheson, 2 Cir., 1953, 202 F.2d 38.

that the burden of proof is met by the creation of a substantial doubt.[8]

The courts, or some of them, seem to have held that the ruthlessness of the Fascist regime in Italy was such that opposition to military service there would have been futile and so service in that army could not have been voluntary.[9] This step seems to have stricken from the statute, at least so far as Italy under Fascism is concerned, that provision which says a national of the United States loses his nationality by entering or serving in the armed forces of a foreign state.

The present opinion of this court takes one more step. To understand this step we must turn to the facts of the case. Soccodato actually performed five acts specified in the statute as acts of expatriation. He took the oath of allegiance when he was twenty years old upon entering the Italian army. He entered that army twice, once when he was twenty years old and again when he was twenty-five years old—his official military record says "spontaneously" as to the first time and "upon his own application" as to the second. He voted in two elections, one in 1946 when he was thirty-one and again in 1948 when he was thirty-three.

Soccodato was born in New York, was taken to Italy when he was six, married there, raised a family there, and served some six years in the Italian army without protest or affirmation of his American citizenship, the last five years while Italy was at war with the United States and he was a prisoner of war. He did not attempt to return to the United States until 1947, and he did not seriously press his effort until 1952.

Upon the trial in the District Court the court had before it various items of evidence. It is not necessary to go into all of it. There were two affidavits by Soccodato, executed at the American Consular Service at Naples, one dated October 8, 1947, and the other May 19, 1952. In the latter he stated that in 1940 "I asked again to join the army because I was unemployed and I found no way out to support my wife and four children." That explanation coincides with the notation on his military record, to which I have referred. In respect to voting he stated: "I desire to clarify anyhow that while personally I was not threatened by anyone, I voted because of all the electoral propaganda and what they were saying around." And again he stated: "I voted on April 18, 1948, because I desired to give my contribution against Communism." There was an affidavit of a village priest at Salerno, in which the affiant stated "That in the two political elections of the years 1946 and 1948, I persuaded Mr. Enrico Soccodato, son of the late Nicola, who absolutely did not want to vote, to comply with that duty, in order to save the sure votes of the Christian Democracy." Nothing was said in these affidavits of Soccodato and the priest concerning compulsion upon the second entry into the army, or upon voting, or as to any sanctions applicable for failure to vote. Indeed quite the contrary impression is conveyed by these documents.

Upon the trial in the District Court Soccodato took the stand and testified as to his second entrance into the army: "There was a general call to the Army. There were posters all over in our little town to call everybody to active duty. * * * They called me automatically. * * * If I did not report, I would have been declared a deserter. * * * I would have been arrested and my family would have lost the food ration coupons that they needed to live." In respect to voting he testified: "If I did not vote, I would lose my civil rights, my certificate of good behaviour would have been disqualified and I do not find any more job. * * * They [relatives] would have been deprived of their ration

8.  Alata v. Dulles, supra.

9.  Acheson v. Maenza, D.C.Cir.1953, 92 U. S.App.D.C. 85, 202 F.2d 453; Augello v. Dulles, 2 Cir., 1955, 220 F.2d 344; Alata v. Dulles, supra.

card. * * * I was compelled by the law to vote. There were signs and posters that we were to vote." A witness who was a lawyer admitted to the bar in Italy testified that all citizens were compelled to serve in the Italian army. Soccodato's brother-in-law testified that one who did not vote in the national elections in 1946 "would be punished with sanctions, different sanctions, such as a fine, or by losing his food ration cards."

The trial judge saw the witnesses on the stand and observed their demeanor while testifying. At the end of the hearing the judge said: "With those affidavits, as compared to the testimony that he has given today, I can do only one thing, and that is to enter judgment for the defendant * * *." In short the trial judge simply did not believe the oral testimony but believed the affidavits filed officially and the official documents. He specifically found the service in the Italian army to have been voluntary and the voting in 1946 to have been without coercion or compulsion. He based his judgment upon those two acts of expatriation. On that record this court reverses. It does so by application of a rule which it says applies in expatriation cases and is in addition to the "clearly erroneous" rule laid down by the Rules of Civil Procedure. It does not say precisely what that rule is, and so the terms of the rule must be derived from what the court is doing.

The opinion says that, unless the evidence of expatriation is clear, unequivocal and convincing—not only clear and convincing but also unequivocal—in the opinion of the appellate court, a finding of expatriation by the trial court is clearly erroneous and will be reversed. The most that could possibly be said of the evidence favoring the applicant at bar is that it created a conflict. Viewed in the light of this record the opinion and decision mean that, if there is a conflict in the evidence sufficient to raise a substantial doubt in the mind of this court, a finding of fact by the trial judge adverse to the applicant is clearly erroneous, no matter how the trial judge evaluates the conflicting evidence.

This opinion of this court, as I have already said, is another long step away from the clear provisions of the statutes. Maybe this is not the actual step; maybe it is merely the frank and lucid statement of a step already taken. In either event in my opinion this additional step should not be taken. The universally applicable rule as to this court's function in respect to findings of fact ought to apply to the findings in this case. To my way of thinking, the determination of the District Court as to whether the service in the Italian army and the voting were voluntary was a resolution of an issue of fact upon conflicting evidence. The judge said the evidence left him with but one thing to do; he had no doubt upon the matter. This court is saying that he should have had a doubt; he should have believed the oral testimony, in part at least; and since he should have had a doubt his finding of fact was clearly erroneous, he should have made the opposite finding, and his judgment should have been against expatriation and for the applicant.

I do not see that the present opinion leaves anything to the statutes, so far as Italians in the Fascist period are concerned. Certainly there was in all cases a call to the army. Certainly most of the men called were less than twenty-one years old. Certainly if they reenlisted after unlimited discharge they did not take another oath of allegiance—one oath of allegiance is surely good until repudiated by some word or action. And certainly there was vast public appeal for people to vote in the elections in 1946 and 1948.

I quite agree that American citizenship is a precious possession and ought not to be withdrawn lightly. But precious possessions ought to be cherished manifestly, even protected, by the possessors thereof. Moreover this citizenship is a hard-bought heritage; it is not a free gift of some inexhaustible and indestructible supplier of gifts. Those

who have it ought to regard and treat it with care. I think we are not too callous if we view with a skeptical eye the claims of a person who lives from childhood to middle manhood in a foreign country, swears allegiance to it, fights in a war for it, raises a family there, votes in its elections, repeatedly asserts his citizenship in it—and all without once asserting, or claiming, or seeking to preserve his American citizenship. I think he owes his American citizenship at least some slight semblance of a duty.

I think that on this record the findings of the trial court were not clearly erroneous, and I would not write a new rule in this regard for expatriation cases. I find myself in agreement on the point with the Second,[10] the Ninth,[11] and the Tenth[12] Circuits.

10. Pandolfo v. Acheson, supra note 7.

11. Lew Wah Fook v. Brownell, 1955, 218 F.2d 924; Attorney General of United States v. Ricketts, 1947, 165 F.2d 193.

12. Zimmer v. Acheson, 1951, 191 F.2d 209.