Edwin ZUNDEL, Plaintiff and Appellee,

v.

Joseph M. ZUNDEL, Defendant and Appellant,

and

Elmer J. Zundel, Minnie Rossetti, Albert C. Zundel, Esther L. Shaw, August A. Zundel, Leslie Zundel, Deceased, and all persons unknown claiming any estate in, or lien or encumbrance upon, the property described in the Complaint, Defendants and Appellees.

Civ. No. 9531.

Supreme Court of North Dakota.

April 12, 1979.

Rehearing Denied April 24, 1979.

---

Roy A. Holand, LaMoure, for defendant and appellant.

Lashkowitz Law Offices, Fargo, for plaintiff and appellee; argued by Senior Law Student William Kennelly and Herschel I. Lashkowitz.

SAND, Justice.

Edwin Zundel brought an action in LaMoure County District Court seeking the imposition of an implied trust over certain lands of which his brother, Joseph Zundel, has been the record title owner. Edwin contended the real estate was purchased in 1941 under a contract for deed in which Joe was named as vendee, but that the purchase price was paid by their mother, Justina, now deceased. The district court determined Joe held the realty in trust and or-dered it be divided between the seven surviving Zundel brothers and sisters.

The land in question, approximately 440 acres located in LaMoure County, was originally acquired by the parties' father, Gottfried Zundel. Prior to his death in 1931, Gottfried transferred the land to his wife, Justina, who continued to own the land and operate the farm located thereon until the mid-1930's when the Federal Land Bank acquired it following foreclosure of a mortgage on the land and a subsequent deed. After the foreclosure sale, Justina and her family continued to reside on and operate the farm under a lease arrangement with the Federal Land Bank.

In 1941 Joe entered into a contract for deed with the Federal Land Bank for the purchase of the land. The contract provided for a purchase price of $4,000 with a $500 down payment and one-third of each year's crops grown on the land be paid to the Federal Land Bank until the balance due on the contract was retired. The contract also provided it was subject to the terms of the lease with Justina which was assigned to Joe.

At the time Joe entered into the contract for deed in 1941, only he, his mother, and three of his brothers (August, Albert, and Edwin) remained on the farm. August moved from the State in the fall of 1941; Albert left to serve in the armed services in the spring of 1942; and Edwin attended high school until the spring of 1942, at which time he started farming with his mother and his brother Joe. Evidence was introduced at trial that the three older brothers and sisters (Minnie, Elmer, and Esther) periodically returned to the farm during this time and subsequent thereto to help on the farm. The length of the visits and extent of the help rendered, however, was in dispute.

The down payment for the purchase of the property was made by check written by Joe on his mother's account. Testimony was offered that money in this bank account, as well as money used later to pay for the remainder due on the contract for

deed, was obtained through the farming efforts of Justina. Joe testified, however, the money in the bank account was partially his as he deposited money from his farming operations into his mother's account and did not open his own account until some time after the purchase of the land. Joe stated he was authorized to write checks on his mother's account and frequently did so in the payment of farm expenses. A bank officer testified the practice of children writing checks on their parents' bank accounts was not uncommon during that period of time.

Four of the Zundel brothers and sisters testified that although Justina purchased the property in question, she wanted legal title placed in Joe's name to avoid payment of the prior mortgage. They testified Justina feared if the land was purchased in her name she might become liable on the approximate $12,000 mortgage that was foreclosed on in 1937. They stated that because August and Albert were planning to leave the farm at the time of the purchase, Justina wanted the land in Joe's name as he was the eldest son remaining on the farm. They further testified the Zundel family discussed the purchase of the land and the particular purchase arrangement both before the contract was entered into and later when the children returned to the farm for visits.

Joe contended he was the sole negotiator for the purchase of the land, and although his mother approved of the purchase she did not desire to purchase the land herself because if Joe left the farm Justina feared she might lose it again without his help. Joe testified he used income not only from the land in question but also from other land he farmed to complete the purchase in a shorter time period than provided for under the contract for deed. Payment under the contract was completed and the deed was issued to Joe in 1943.

In approximately 1943, Joe was married and moved off the home farm to a house a short distance away. Justina continued to reside on the farm, together with Edwin and Albert, who returned from the service 100% disabled.

After the purchase of the land in 1941, it, along with other lands owned or leased by Justina and Joe, were farmed through the joint efforts of Joe, Justina, and Edwin.

During a part of the 1950's Joe and Edwin farmed much of their land, as well as that of their mother, in a somewhat informal partnership arrangement under which equipment, expenses, and profits were shared. In 1957 the informal partnership arrangement ended and the land in issue in this case was farmed by Edwin with him receiving three-fourths of the income and Justina receiving one-fourth. This arrangement appears to have lasted up until 1964, when Justina died. Edwin testified after his mother's death he, Joe and Albert arrived at an arrangement concerning the 440 acres where Albert would be allowed to reside on that tract of land on which the buildings were located, while Edwin and Joe would each get a quarter section of the remaining land and a cash settlement would eventually be made to the other brothers and sisters. Edwin would be allowed to farm the land and keep seven-eighths of the income, and Joe was to get the remaining one-eighth of the income. (Joe's one-eighth share was to represent a one-fourth share from the quarter of land he was eventually to receive spread over both quarters to be farmed by Edwin.) Edwin's testimony indicated neither a cash settlement to the remaining brothers and sisters nor a final settlement to divide the land was arrived at because Joe kept putting the issue aside when approached with it.

Joe testified that following his mother's death he agreed to rent the land in question to Edwin. Joe stated although he received some money from this rental arrangement, the money he received did not equal the amounts Edwin was to pay under the agreement despite repeated requests for the money by Joe. He stated it was Edwin's failure to make complete payments, along with other incidents, that eventually led to a decision by Joe to no longer allow his brother to farm the land.

This case was commenced by issuance and service of a summons and complaint dated 29 July 1977. An amended complaint was filed by Edwin on 31 January 1978 seeking a division of the land among the seven living Zundel children. Joe filed an amended answer in which he cross-petitioned seeking the court to quiet title in his name and requiring Edwin to make an accounting for the use of the land for the years 1958 through 1977. Following a bench trial, the district court made, among others, the following pertinent findings of fact:

"That the said land was purchased in 1941 from the Federal Land Bank of St. Paul, Minnesota, in the name of Joseph M. Zundel, Defendant herein, with moneys belonging to his mother, the late Justina Zundel.

"That there was an understanding by and between Justina Zundel and the Defendant, Joseph M. Zundel, that he would divide the land between his brothers and sisters herein after his mother's demise.

"That Defendant, Joseph M. Zundel, farmed Justina's land, including the land purchased from the Federal Land Bank and other land, he, Defendant, Joseph M. Zundel, rented from the mid 1930's until 1956, that the Plaintiff, Edwin Zundel, assisted Defendant, Joseph M. Zundel, and others in farming the land from the early 1940's onward, and that Justina Zundel got all the income from the land purchased from the Federal Land Bank and other lands she had acquired through the 1940's and 1950's.

"That Plaintiff, Edwin Zundel, Defendant, Joseph M. Zundel, their mother, the late Justina Zundel, and Plaintiff, Edwin Zundel, and Defendant, Joseph M. Zundel, combined paid the real estate taxes on the land over the years involved herein.

"That the Defendant, Joseph M. Zundel, paid the insurance premiums on the buildings but kept the moneys paid for a loss stating it was reimbursement to him for premiums paid.

"That the Plaintiff, Edwin Zundel, paid the Defendant, Joseph M. Zundel, approximately Five Thousand Dollars ($5,000.00) in 1975 to compensate Defendant, Joseph M. Zundel, for taxes Defendant heretofore had paid on the said land.

"That the Defendant, Joseph M. Zundel, made no overt attempt to exercise control over the land that evidenced his outright ownership until 1976 and after he was involved in litigation with Plaintiff on another matter.

"That Defendant, Joseph M. Zundel, in a conversation with Plaintiff's son, Loren, in April, 1977, stated the land should be divided between the seven (7) Zundel brothers and sisters."

The district court's conclusions of law stated in part:

"That the trust created is a trust supportable either as a resulting or a constructive trust and that proof of the trust is clear, specific and substantial.

"That Defendant, Joseph M. Zundel, repudiated the trust arrangement in 1977.

"That equity compels a division of the realty by and between the seven (7) Zundel brothers and sisters, each to receive a one-seventh (1/7) interest in said land.

"That Defendant, Joseph M. Zundel, should be reimbursed for the payment of real estate taxes on said land herein for the years 1975, 1976, and 1977 and insurance premiums paid on said land for the years 1975, 1976, and 1977 which has not already been recompensed in the sum of Two Thousand Seven Hundred Eighty-eight Dollars and Thirty-seven Cents ($2,788.37).

"That Defendant, Joseph M. Zundel's Counterclaim be dismissed in all things."

Judgment was entered in accordance with the court's findings of fact and conclusions of law. Joe filed a motion to amend the findings of fact and conclusions of law as to provide in summary that the land was not purchased with Justina's money, that no trust was created, and that Edwin be required to make an accounting for rent due Joe. The motion also requested, in the event the court rejected this amendment, an accounting of profits of the trust property be made by Edwin for the time he held

the property and that Joe be reimbursed by the other beneficiaries for expenses he incurred while holding title to the land. Joe's motion was denied by an order of the district court dated 30 May 1978. Joe appealed from both the order denying his motion and the earlier judgment.

We determine the following to be the issues on appeal:

(1) Was the evidence sufficient in this case to create an implied trust;

(2) Was Edwin barred from bringing his action by the statute of limitations;

(3) Should Edwin be required to make an accounting for the period of time he was in possession of the trust property.

The trial court concluded the facts of this case supported the creation of either a constructive or a resulting trust. The classification of constructive or resulting trusts has been eliminated by statute in North Dakota as all trusts created by operation of law are termed implied trusts. Section 59–01–05, North Dakota Century Code.[1]

■ Although the "constructive" and "resulting" trust labels have been eliminated by North Dakota statute, the substantive considerations that give rise to these trusts created by operation of law remain the same. Consequently, the considerations determinative in the creation of constructive and resulting trusts are important in determining the creation or existence of an implied trust under North Dakota statute. Because we determine the record supports the creation of a resulting trust, we need not examine the elements or existence of a constructive trust in this case.

■ Generally where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid. Restatement of Trusts 2d § 440; *Smithsonian Institution v. Meech*, 169 U.S. 398, 18 S.Ct. 396, 42 L.Ed. 793 (1898); *Kernkamp v. Schulz*, 44 N.D. 20, 176 N.W. 108 (1919); § 59–01–06(4), NDCC.

"A 'resulting trust' exists where the acts or expressions of the parties indicate an intent that a trust relation resulted from their transaction." *Scheid v. Scheid*, 239 N.W.2d 833, 837 (N.D.1976). Thus, whether or not a resulting trust has been created is primarily a question of intention. *Shong v. Farmers' & Merchants' State Bank*, 70 N.W.2d 907 (N.D.1955); see, Note, *Trusts—Implied Trusts in North Dakota*, 29 N.D.L.Rev. 58 (1953).

This court has, however, also stated the general rule that if a father or parent pays the consideration and has the conveyance run through his child, there is a rebuttable presumption of a gift. *Shong v. Farmers' & Merchants' State Bank, supra.* We have also stated "[m]ost decisions treat the cases in which the mother is the payor and the child is the grantee in the same way as where the father pays the purchase price." *Shong, supra*, at 912.

"The facts aside from the source of payment and the form of the deed are important by way of rebutting or corroborating the finding of a gift intent. The health, age, financial condition and the business experience of the mother are to be considered in determining the issue. It would be exceedingly natural for a wealthy mother to make a gift of part of

1. Section 59–01–06, NDCC, sets forth four instances in which an implied trust may arise, and provides as follows:

"An implied trust arises in the following cases:

"1. One who wrongfully detains a thing is an implied trustee thereof for the benefit of the owner;

"2. One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an implied trustee of the thing gained for the benefit of the person who would otherwise have had it;

"3. Each one to whom property is transferred in violation of a trust holds the same as an implied trustee under such trust, unless he purchased it in good faith and for a valuable consideration;

"4. When a transfer of real property is made to one person and the consideration therefor is paid by or for another, a trust is presumed to result in favor of the person by or for whom such payment is made."

her property to her child. The opposite, however, is true if the mother has little. See Volume 2A, Bogert, Trusts and Trustees, Section 460, page 500." *Shong v. Farmers' & Merchants' State Bank, supra* at 912.

We also find pertinent to this case the following comment from the Restatement of Trusts 2d § 443:

"The intention of the payor not to make a gift to the transferee may be shown not only by oral declarations of his intention, but also by the circumstances under which the transfer is made. . . . the fact that the circumstances are such that the payor would have a reason for taking title in the name of another other than an intention to give him the beneficial interest is an indication that he did not intend to make a gift . . . . .

"It is the intention of the payor at the time of the transfer and not at some subsequent time which determine whether a resulting trust arises. . . . The conduct of the payor and of the transferee subsequent to the transfer, however, may be such as to show that at the time of the transfer the payor did not intend to make a gift to the transferee. Thus, the fact that the payor manages the property, collects rents, pays taxes and insurance, pays for repairs and improvements, or otherwise asserts ownership, and the acquiescence by the transferee in such assertion of ownership, is evidence to rebut the inference of an intention by the payor to make a gift to the transferee."

When a party seeks the imposition of an implied trust, he carries a heavier burden of proof than the mere preponderance of evidence standard required in most civil cases.

"The courts are reluctant to ingraft a trust by parol on the legal title to real estate, and there is perhaps no better established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence. 23 A.L.R. 1500, 1502 and cases cited; *Carter v. Carter*, 14 N.D. 66, 103 N.W. 425; *Holler v. Amodt*, 31 N.D. 11, 153 N.W.

465; *Bernauer v. McCaull-Webster Elevator Co.*, 41 N.D. 561, 171 N.W. 282. These cases hold that the proof of an implied or resulting trust must be clear, specific, substantial, and satisfactory." *Shong v. Farmers' & Merchants' State Bank supra* at 911.

In arguing the evidence in this case does not support the existence of a resulting trust, Joe relied heavily upon what he called the "Bodding doctrine" as taken from the opinion of this court in *Bodding v. Herman*, 76 N.D. 324, 35 N.W.2d 561 (1948), where we stated:

"The evidence to establish an implied trust, however, must be clear and convincing. There must be a satisfactory showing of a wrongful detention of the property, or fraud, undue influence, the violation of a trust, or other wrongful act by virtue of which the party is holding title to property which he should not hold under the rules of equity and good conscience. *The evidence must be strong enough to lead to but one conclusion. If the evidence is doubtful or capable of reasonable explanation upon theories other than the existence of a trust it is not sufficient to establish a trust.* See 35 A.L.R. 286, 307; 45 A.L.R. 852; 80 A.L.R. 198 and cases cited. See also 2 Bogert on Trusts and Trustees, § 464." [Emphasis added.] 35 N.W.2d at 563.

See also, *Scheid v. Scheid, supra; Lander v. Hartson*, 77 N.D. 923, 47 N.W.2d 211, 215 (1951).

■ Joe argued, in effect, that under the *Bodding* doctrine a trust may not be sustained if any of the evidence presented at trial supports a theory other than the existence of a trust. We believe the interpretation of the *Bodding* language urged on us by Joe would create a burden of proof upon a claimant equivalent to or greater than the "beyond a reasonable doubt" standard required in criminal cases. We decline to impose such a high burden as a prerequisite to what has historically been an equitable remedy.

■ The plain language of prior opinions of this court have stated a clear and con-

vincing standard of proof is the necessary requirement to the establishment of an implied trust. Not only does the weight of evidence required to meet such a standard not rise to the level of that required to meet the standard of beyond a reasonable doubt, but also the evidence need not be undisputed to reach the clear and convincing standard. *Crain v. Keenan*, 218 Ark. 375, 236 S.W.2d 731 (1951). Rather, under the clear and convincing standard, the evidence must be such that the trier of fact is reasonably satisfied with the facts the evidence tends to prove as to be led to a firm belief or conviction. *Williams v. Wager*, 64 Vt. 326, 24 A. 765, 766 (1892); *In re Chappell*, 12 Ohio Op. 499, 33 N.E.2d 393, 397 (Ct.App. 1938).

The requirement announced in *Bodding* that "the evidence must be strong enough to lead to but one conclusion" is separate and distinct from claimant's requirement of meeting the clear and convincing evidence standard. The *Bodding* doctrine requires the evidence upon which the implied trust rests, whether presented by claimant or defendant and as weighed by the trier of facts, must be clear and convincing and must be strong enough to support but one conclusion. *Bodding* does not stand for the proposition, as contended by Joe, that if conflicting or disputed evidence is introduced an implied trust cannot be found to exist. The trier of fact is always given an opportunity to observe the demeanor of the witness, to weigh, judge, test, and compare evidence in connection with all the facts and circumstances in evidence. *Burningham v. Burke*, 67 Utah 90, 245 P. 977 (1926). The trier of fact reaches its decision only after this weighing process is complete. The existence of conflicting testimony or other explanations of the evidence does not prevent the factfinder from reaching a conclusion the evidence is clear and convincing or even clear beyond a reasonable doubt. If we were to apply the *Bodding* doctrine as construed by Joe it is doubtful an implied trust could ever be established unless the opposing party so agrees because invariably evidence in opposition to an implied trust would be introduced.

Because often the most critical question as to who should prevail in lawsuits such as this rests upon the sufficiency of evidence produced to meet the extraordinary burden of proof required, the standard of review used by this court in its appellate function is vitally important. Under North Dakota Rule of Civil Procedure 52(a), our scope of review is limited to determining whether or not the district court's findings are clearly erroneous, giving due regard to the opportunity of the trial court to assess the credibility of witnesses. When, as here, we are reviewing findings made pursuant to the clear and convincing evidence test, the trial court's opportunity to judge credibility must still be given considerable weight. The rule that the evidence of an implied trust must be clear and convincing is one to be applied by the trial court which sees and hears the witnesses and is charged with the duty of weighing their testimony. If the record contains substantial evidence sustaining the decision of the trial judge that may fairly be said to comply with the requirement that the proof be clear and convincing, this court will not substitute its judgment for that of the trial court. *Breelan v. Hide-A-Way Lake, Inc.*, 585 F.2d 716, 722 (5th Cir. 1978); *Collins v. Parkinson*, 98 Idaho 871, 574 P.2d 913, 916 (1978); *Matter of Estate of Courtright v. Robertson*, 99 Idaho 575, 586 P.2d 265 (1978); *Hunt v. Pan American Energy, Inc.*, 540 F.2d 894, 908–901 (8th Cir. 1976), *cert. denied* 429 U.S. 1062, 97 S.Ct. 786, 50 L.Ed.2d 778. *Contra, Soccodato v. Dulles*, 96 U.S.App.D.C. 337, 226 F.2d 243 (1955). The mere fact evidence was presented contrary to a particular finding does not make it clearly erroneous, rather, a finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *Haugeberg v. Haugeberg*, 258 N.W.2d 657, 659 (N.D.1977); *In re Estate of Elmer*, 210 N.W.2d 815 (N.D.1973); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

The district court's findings in this case that the land in question was purchased with money belonging to Justina Zundel, and that the intent of Joe and his mother was that Joe hold the land for the benefit of his mother and divide it on her death between her surviving children, is supported by substantial and competent evidence and thus is not clearly erroneous. The check used to pay for the land was drawn upon Justina's account. The circumstances under which the land was farmed, income retained, improvements made and taxes paid are consistent with an intent to create a trust. Also, circumstances existed which rebutted any presumption that the land was meant as a gift to Joe. Justina feared if title to the land was placed in her name she might again become liable on the original $12,000.00 mortgage. The fact the land had been foreclosed on only a few years before, together with testimony of the Zundel children, indicated Justina was not extremely wealthy at the time of the purchase as to be making sizeable gifts, but rather she was a business woman raising a family without benefit of a husband and engaged in the operation of a farm of which farmland would be a vital necessity. We also note the credibility of Joseph Zundel as a witness was shaken a number of times during his cross-examination. When the trial court weighed credibility of the witnesses and the inferences raised by the evidence, it could reasonably conclude the intent to create an implied trust was proved by clear and convincing evidence. Therefore, the trial court's determination on this issue is affirmed.

Joe next contended that Edwin was barred from bringing this action by the statute of limitations. Section 28–01–16, NDCC, provides an action upon an obligation, express or implied, must be commenced within six years after the cause of action has accrued. Joe argued the statute of limitations on this action started to run no later than 1964, i. e., the date of Justina's death, when neither the property nor the income therefrom was divided equally among the brothers and sisters. He argued that not only did the Zundel children not

receive an accounting of their proportionate share of the income under the trust agreement but that also a dispute arose over the operation and division of the alleged trust land in 1964, according to the testimony of Edwin. We find pertinent on this issue the following language from Bogert, Trusts and Trustees (2d ed. 1962) § 952:

"Since trusts of this type are founded on the theory that the settlor intended and the trustee acquiesced in them, the normal holding of a trustee under the resulting trust should be deemed to be friendly until he does some act to contradict that supposition. The beneficiary should be entitled to rely on the assumption that the resulting trustee is holding him for and in subordination to his equitable interest, unless he receives contrary evidence by reason of an assertion by the trustee that he is holding for himself or for others than the cestui. The mere existence of such a trust, therefore, as in the case of an express trust, should not give rise to a cause of action in favor of the cestui, and should not be a reason for the running of any Statute of Limitations against him. Some act of denial of the trust or assertion of a hostile interest by the resulting trustee should be necessary to give the resulting cestui a cause of action and so to start the relevant Statute of Limitations running.

"The cases almost universally support this position regarding resulting trusts and the statute. Where the resulting trustee has taken no positive stand after his acquisition of title, his holding is deemed friendly, and subordinate to the equitable interest of the beneficiary, and no statute runs.

. . . . .

"If the resulting trustee repudiates his obligation, but later changes his attitude and recognizes the existence of a trust, such later conduct causes the statute to stop running." [Footnotes omitted.]

The statute of limitations does not begin to run in the case of a purchase money resulting trust such as the one in

this case until the trustee clearly repudiates his trust. *Jirka v. Prior*, 196 Neb. 416, 243 N.W.2d 754, 759 (1976); *England v. Winslow*, 196 Cal. 260, 237 P. 542, 546 (1925). See, Annot. 45 A.L.R.2d 382; 75 Am.Jur.2d *Trusts* §§ 588, 591, 593; Bogert, Trusts and Trustees (2d ed. 1962) § 952. Thus, the statute does not begin to run as long as there is a recognition of the trust, or a repudiation followed by a subsequent recognition by the trustee. *Shirley v. McNeal*, 274 Ala. 82, 145 So.2d 415, 419 (1962); *Henslee v. Merritt*, 263 Ala. 266, 82 So.2d 212, 215 (1955). Whether or not the trustee has repudiated his trust and the statute has begun to run must be determined upon the facts of each individual case. *Jirka v. Prior, supra.*

In this case the district court found that Joe did not repudiate the trust until 1977. We conclude the district court's finding is supported by substantial evidence and is not clearly erroneous. Consequently, the statute of limitations did not begin to run until that date. Testimony indicated Justina Zundel received all or part of the income from the land in issue until her death in 1964. Clearly there was no repudiation of the trust prior to Justina's death under those facts. Joe argued, however, that failure to make payments or divide the land to the four brothers and sisters who have received no income from the alleged trust property, was a repudiation of the trust, at least as to those persons. We disagree. Testimony indicated that following Justina's death, the parties disagreed as to how the land should be divided. A trustee's disagreement as to the manner of a division is not a repudiation when he recognizes a division should be made. Nor is a trustee's failure to disburse income or make an accounting to the beneficiaries necessarily a repudiation of the trust. The mere failure of a trustee to perform his duty is not sufficient to repudiate a resulting trust, rather there must be a distinct act of repudiation amounting to a denial of its existence. *England v. Winslow, supra* at 547.

In this case it appears the four Zundel children who did not receive any use or income from the real property following their mother's death, did not request nor necessarily desire an accounting. Apparently they relied on the word of their brothers that eventually a cash settlement would be made or else they simply were not concerned. In either instance, under the facts of this case, Joe's failure to make an accounting in the years following his mother's death cannot be said to be a clear repudiation when no request for an accounting was made. We also note that Edwin, as one of the beneficiaries, farmed the land following his mother's death, and Albert, as another beneficiary, resided on the land. Allowing the use of the land by two of the intended beneficiaries can hardly be considered a repudiation of the trust, at least as to those beneficiaries. Finally, the district court found that Joe stated in a conversation with his nephew, Loren, in April 1977, that the land was to be divided between the seven surviving Zundel children. His statement that the land was to be divided between himself and his brothers and sisters was a recognition or acknowledgment by Joe of the trust and started the statute of limitations to run anew even if there was a prior repudiation. *Henslee v. Merritt, supra; White v. Chichester*, 227 Miss. 426, 86 So.2d 341 (1956). The district court's finding that Joe did not repudiate the trust until 1977 and that the statute of limitations did not begin to run until that date is not clearly erroneous and is thus affirmed.

As the final issue on appeal, Joe contended the district court erred in not requiring an accounting be made by Edwin for the years he has been in possession of the trust property. Generally, a resulting trustee "should be required to account for the profits or rental value of the land from the date of its acquisition by him, and may be allowed the benefit of payments made by him on account of taxes, interest on a mortgage, repairs, improvements, and similar items." Bogert, Trusts and Trustees, (rev. 2d ed. 1977) § 465; *Islas v. Islas*, 213 Cal.App. 412, 28 Cal.Rptr. 850 (1963); *Meyer v. Meyer*, 285 S.W.2d 694 (Mo.1956); *Van Buskirk v. Van Buskirk*, 148 Ill. 9, 35 N.E. 383 (1893); 76 Am.Jur.2d *Trusts* §§ 512–514.

We conclude in this case that when Edwin, as one of seven beneficiaries, was in possession of property that should have properly been divided among all the beneficiaries at the time of Justina's death, he should be subject to an accounting for the period of his possession since Justina's death. See, *Boehmer v. Silverstone*, 95 Or. 154, 186 P. 26 (1920); *McBride v. McIntyre*, 91 Mich. 406, 51 N.W. 1113 (1892).

A trial court's order refusing to alter or amend a judgment will not be set aside on appeal except for an abuse of discretion. *Porter v. Porter*, 274 N.W.2d 235 (N.D.1978); *Hefty v. Aldrich*, 220 N.W.2d 840 (N.D.1974). The judgment of the district court ordered payment be made to Joe in the amount of $2,788.37 for unreimbursed insurance premiums and real estate taxes paid by Joe. Joe has failed to demonstrate on appeal that this amount for unreimbursed insurance premiums and real estate taxes was in error or that the trial court's denial of his motion to amend as to these payments was an abuse of discretion. We do, however, agree with Joe that the failure of the trial court to order an accounting of income from the property from the time of Justina's death to date was an abuse of discretion. Such an accounting of profits, however, should not be limited solely to Edwin. We note testimony at trial indicated Edwin made crop share payments to Joe since their mother's death although not on a regular basis. The payments received by Joe may constitute profit from the trust property and thus should be included in the accounting. We further note Albert has resided on and made use of part of the trust property and such a use of the property since his mother's death may constitute a profit as to also subject Albert to the accounting.

Accordingly, this case is remanded for modification of the district court judgment to provide for an accounting of profits and, as so modified, is affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.