FILED
United States Court of Appeals
Tenth Circuit

May 29, 2013

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

    v.

ROBERT TINGEY, as Trustee for the
D.E. Brown Family Trust,

      Defendant - Appellant,

DOUGLAS BROWN; BARBARA
BROWN; UTAH STATE TAX
COMMISSION; GILBERT JENSEN,

      Defendants.

No. 12-4000

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. NO. 2:07-CV-00810-BSJ)**

---

Russell S. Walker (Anthony M. Grover with him on the briefs), Woodbury &
Kesler, P.C., Salt Lake City, Utah, for Defendant - Appellant.

John A. Dudeck, Jr., Attorney, Tax Division, Department of Justice, (David
Barlow, United States Attorney, Kathryn Keneally, Assistant Attorney General,
Teresa E. McLaughlin, Attorney, Tax Division, Department of Justice, with him
on the brief), Washington, D.C., for Plaintiff - Appellee.

---

Before **BRISCOE,** Chief Judge, **HOLLOWAY**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

The district court permitted the government to foreclose on federal tax liens on a ski cabin (the Ski Cabin) titled in the name of the D.E. Brown Family Trust (Family Trust), whose beneficiaries were Douglas Brown's wife and children. The taxes were owed by Douglas Brown (Brown) and his wife (together, the Browns), not the trust, but the court found that the Browns were the beneficial owners of the cabin because Brown had a purchase-money resulting trust (PMRT) arising from his having purchased the cabin and then conveyed it to the Family Trust.[1] The trustee of the Family Trust, Robert Tingey, appeals. He argues (1) that the government waived its claim that the Browns held the beneficial interest in the cabin, and (2) that the district court erroneously concluded that a PMRT arose under Utah law. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The government did not intentionally relinquish its claim to the cabin, and the evidence supports the district court's determination that Brown intended the trust to hold the cabin for his benefit.

---

[1] Although the district court repeatedly states its ruling that a PMRT in the Ski Cabin arose "in favor of Douglas Brown," Aplt. App. at 175, 191 (Findings of Fact & Memorandum Op. at 45, 61, *United States v. Brown*, Nos. 2:07-cv-00810-BSJ & 2:07-cv-00127 BSJ (D. Utah Oct. 11, 2011) (Mem. Op.), it then, without any further explanation or analysis, states that the Browns, both Brown and his wife, held "the beneficial interest" in the cabin. *Id.* But neither Brown nor his wife is a party to the appeal, and Tingey has not raised any issue as to whether it is Brown alone or the Browns together who have the beneficial interest. We will therefore proceed to address only whether a PMRT was created for Brown's benefit and assume that it is inconsequential whether only he, or both Browns, held the beneficial interest in the cabin.

-2-

## I.    BACKGROUND

### A.    Tax Liability

The Browns owe federal income taxes for the tax years 1993, 1994, 1995, 1996, 1999, 2001, 2002, and 2005; and Brown owes federal gift taxes for the tax years 1994 and 1995. The district court's March 7, 2011, order reducing the tax assessments to judgment reflects that the Browns owed a total of $2,076,424.80 as of December 31, 2010. The Browns do not dispute this liability. The government filed notices of federal tax liens respecting the Browns' income- and gift-tax liabilities for each of these tax years.

### B.    D.E. Brown Family Trust

On June 22, 1993, Brown created the Family Trust, an irrevocable trust whose beneficiaries are his wife and their four children. Although the Trust Agreement named his brother, Mark Brown, as trustor, Mark contributed no assets to the trust; only Brown contributed assets. The agreement named Tingey, the brother-in-law of Brown's wife, as trustee.

### C.    Purchase and Use of the Ski Cabin

In June 1993 the Browns negotiated the purchase of the Ski Cabin from Gilbert Jensen. Brown paid Jensen a $5,000 earnest-money deposit. After the parties agreed on the terms of the sale, Jensen conveyed undivided one-half interests in the cabin to two trusts, the Gilbert Willard Jensen Trust and the Myrna Merrill Jensen Trust (the Jensen Trusts). Each of the Jensen Trusts then

-3-

conveyed its one-half interest in the cabin to Tingey, as trustee for the Family Trust. To pay for the cabin, Brown supplied personal funds via a cashier's check payable to the title company to cover the down payment of approximately $72,000. Brown also executed a $200,000 promissory note in favor of the Jensen Trusts, on which he was the sole obligor. As security for the note, he executed a trust deed to the cabin, naming the Jensen Trusts as beneficiaries and himself as the trustor. The trust deed was recorded on June 23, 1993. Brown also executed a security agreement for two pieces of collateral: (1) a Thiokol Snowcat (a snow-plowing implement) and (2) a share of stock in the Silver Lake Company. The share of stock represented the water rights to the cabin; Jensen had prepared a stock certificate in Brown's name at the time of the sale. Jensen valued the share at $50,000, and said that lots without water rights were not marketable. Also, the closing statements, bill of sale, and seller's escrow instructions all reflected that the Jensen Trusts were the sellers and Brown was the buyer of the cabin.

Soon after the closing, a replacement promissory note bearing the date of the closing (June 22, 1993) was executed, naming as obligors both Brown and Tingey, in his capacity as trustee for the Family Trust. A replacement trust deed was also executed, naming as trustors both Brown and Tingey, again in his capacity as trustee.

After the 1993 purchase the Browns promptly began using the Ski Cabin. They performed maintenance work and paid the utility bills and premiums on an

insurance policy for the cabin issued in Brown's name. Tingey performed no maintenance on the cabin. And the Browns used the cabin without Tingey's permission or supervision. Indeed, the district court found that "Tingey knew little or nothing about how the Browns used the [Ski Cabin]." Aplt. App. at 149 (Findings of Fact & Mem. Op. at 19, *United States v. Brown*, Nos. 2:07-cv-00810-BSJ & 2:07-cv-00127 BSJ (D. Utah Oct. 11, 2011) (Mem. Op.). In 2005 Brown leased the cabin to his friend, Charles Jorgensen, and Brown instructed him to pay "rent" directly to the Jensen Trusts to cover the payments on the note. Tingey knew nothing of this transaction.

In addition to payments from Jorgensen, payments on the note came from various sources and in various amounts. The district court found that many payments came from sources closely connected to Brown, including payments directly from the Browns,[2] the Brighton Factor Dealers (Brown's business), a law firm representing Brown, and a company that employed Brown. Other payments came from the Wrenhaven Trust, another trust for which Tingey served as the trustee and to which Brown contributed the assets.

Ultimately, Brown's brother James purchased the Jensen Trusts' remaining interest in the cabin in late 2007 and foreclosed on the trust deed. The Family

---

[2] Although Mr. Jensen, referring to a payment log that he prepared, testified that some payments came from the Browns, he was not more precise about the names on the accounts on which the payment checks were written.

Trust's interest in the foreclosure sale proceeds was $154,236.02, which has been deposited in the district court's registry.

### D.    Brown's Finances in 1993

The year 1993 was a turning point in the Browns' financial condition. The evidence may not have been accessible to others for a while, but it could not have been unknown to the Browns. Although they eventually (in 1997) reported that they owed almost $350,000 in income taxes for 1993, they did not file a timely return. And although Brown was not sued by investors until October 1994 and was not indicted for financial transgressions until December 1995, the claims and charges concerned misconduct beginning in late 1990. Tingey confirmed, perhaps inadvertently, that Brown knew he was in a precarious financial situation when he created the trust. Tingey testified that it was his understanding that Brown "wanted to create the trust in part to set up an entity that would hold some assets separate and apart from him to protect his assets from creditors." *Id.* at 183 (Mem. Op. at 53) (internal quotation marks omitted).

### E.    Brown's Use of the Family Trust in Personal Business Ventures and Securities Fraud

Brown retained significant control over the Family Trust's affairs. Tingey testified that he consulted with Brown and relied on Brown's knowledge of the investment industry in making decisions regarding trust assets. Brown often

presented Tingey with investment opportunities for the trust. Moreover, the trust was intimately intertwined with Brown's business affairs. The Brighton Factor Dealers, which Brown said "'was really just a facilitation of the business where I was working,'" *id.* at 154 (Mem. Op. at 24), was, according to Tingey, "'a dba of the Trust,'" *id.* Yet Tingey's role in the venture was limited to establishing the dba, signing some checks, reviewing the bank statements, and forwarding copies of the statements to Brown.

The Family Trust also was involved with three companies for which Brown worked as an officer or manager: Wellshire Securities (Deutschland) GmbH, Wellshire Services, Inc., and Wellshire Securities, Inc. (collectively, Wellshire Securities). According to the district court, Tingey, at Brown's direction, entered into a series of securities transactions for the Family Trust "directly related to the activities of the Wellshire securities entities." *Id*. at 152 (Mem. Op. at 22). The securities or the money to acquire them all originated with Brown. The district court found:

> With the assent of the trustee, [Brown] made use of the [Family Trust] and its several bank and brokerage accounts to engage in financial transactions that were largely an extension of his own personal dealings and financial affairs involving the business of the Wellshire entities, and otherwise. Beginning in or about October 1994, Brown conducted the business of Brighton Factor Dealers through the [Family Trust's] accounts in an attempt to shelter that economic activity from Brown's mounting potential personal liability arising out of the Wellshire entities' business.

*Id.* at 157 (Mem. Op. at 27).

Brown's activities with Wellshire Securities resulted in the above-mentioned suits against him by investors and a criminal indictment charging him with securities fraud. In the criminal case the Family Trust was placed under court restrictions, which lasted until October 3, 1998, when the trust paid more than $400,000 to the government as restitution, leaving the Ski Cabin as the trust's sole remaining asset.

**F.      District Court Proceedings**

In 2007 the government filed a complaint in the United States District Court for the District of Utah to reduce the tax assessments against the Browns to judgment and to foreclose on the tax liens on the cabin. The district court ultimately granted the government's motion for summary judgment on the claims to reduce the assessments to judgment; but it refused to grant summary judgment to foreclose on the tax liens and held a three-day bench trial in April 2011. The government's theories were that the Family Trust held the cabin as a nominee of the Browns and that the transfer of the cabin to the Family Trust was fraudulent as to creditors. The court ruled (1) that under Utah law the Browns held the beneficial interest in the cabin because the Family Trust held legal title to the cabin for Brown's benefit in a PMRT, and (2) that under federal law the Family Trust held legal title to the cabin as a nominee for the Browns. Accordingly, the court ruled that the government could foreclose on its lien. The court did not rule on the fraudulent-transfer theory, and it is not at issue on appeal.

## II.    DISCUSSION

### A.    Legal Framework for Enforcing Federal Tax Liens

"[T]he IRS may satisfy a tax deficiency by imposing a lien on any property or rights to property belonging to the taxpayer." *Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007) (internal quotation marks omitted). The property may be "not only property and rights to property owned by the taxpayer but also property held by a third party if it is determined that the third party is holding the property as a nominee of the delinquent taxpayer." *Id.* (ellipses and internal quotation marks omitted). A third party holds the property as a nominee if "the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership." *Id.*

To apply the nominee theory, "[w]e look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach." *Drye v. United States*, 528 U.S. 49, 58 (1999). Then, we "determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property'" under federal tax law. *Id.*

The district court determined that the Browns had rights in the cabin under Utah law because the Family Trust held the cabin in a PMRT for Brown's benefit and the Browns held the beneficial interest in the cabin. It then considered the federal question whether a nominee lien should be enforced against the Browns'

interest, concluding that it should. On appeal Tingey does not challenge the district court's ruling that a federal tax lien can be imposed on property in which Brown has an interest based on a PMRT. Rather, he argues (1) that the government waived the right to assert that the Browns held the beneficial interest in the cabin, and (2) that the court erred in concluding that a PMRT was created under Utah law. We review the district court's factual findings for clear error and review its legal conclusions de novo. *See Somerlott v. Cherokee Nation Distribs., Inc.*, 686 F.3d 1144, 1148 (10th Cir. 2012).

### B. Waiver

"Waiver is the intentional relinquishment or abandonment of a known right." *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1077 (10th Cir. 2009) (internal quotation marks omitted). Tingey bases his waiver argument on a stipulated order in Brown's criminal securities-fraud case, which required that the proceeds of certain stock held by the Family Trust be forfeited to the United States as restitution, but lifted any further restraint on remaining trust property. He asserts that the government knew of the Family Trust's claim to the cabin at the time of the stipulation because (1) the indictment in the criminal securities-fraud case included a forfeiture count identifying the Ski Cabin as trust property; (2) inventories provided by Tingey to the government in connection with the civil and criminal securities-fraud cases against Brown listed the cabin as trust property; and (3) a memorandum by two IRS agents of their interview of

Tingey noted his assertion that the Family Trust owned the cabin. Tingey suggests that the government's entering into the stipulation despite this knowledge constituted a waiver of any further right to contest the cabin's ownership.

We disagree. Even if the government was fully aware of the Family Trust's claims to the cabin, its agreement to the stipulated order did not waive its rights to pursue a tax claim. The order said nothing about tax liability or who had beneficial interests in the Ski Cabin. Tingey does not explain how the government's decision not to pursue a claim against the cabin in the securities-fraud litigation constituted an admission, much less a waiver, that the Browns had no property interest in the cabin that could be pursued to recover unpaid taxes. According to the district court, the cabin had not been thought to be proceeds of Brown's criminal conduct.

C.     **Tingey's Substantive Arguments Against the PMRT Ruling**

Tingey argues that even if the government did not waive its claim that Brown held a beneficial interest in the Ski Cabin, the district court erred in concluding that the Family Trust held the cabin in a PMRT for Brown's benefit. First, he argues that no PMRT could arise because the Family Trust, not Brown, paid the purchase price for the cabin. Second, he argues that even if the district court properly found that Brown paid the purchase price for the cabin, it nevertheless erred in finding a PMRT because a PMRT cannot be created in

property to which an express trust holds title and, in any event, the evidence did not support recognition of a PMRT.[3] We begin our analysis by setting forth the Utah law governing creation of a PMRT and the district court's ruling. Then we address Tingey's arguments.

### 1.     PMRTs Under Utah Law and District Court's Ruling

"[A] purchase money resulting trust is an equitable remedy designed to implement what the law assumes to be the intentions of the putative trustor." *Zion's First Nat'l Bank v. Fennmore (In re Estate of Hock)*, 655 P.2d 1111, 1114 (Utah 1982). "'Where a transfer of properties is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid,'" subject to certain exceptions. *Id.* at 1115 (quoting Restatement (Second) of Trusts § 440 (1959)); *accord* Restatement (Third) of Trusts § 9(1) (2003). Thus, a PMRT ordinarily arises when "one party paid the purchase price for property and another party was given legal title." *In re Estate of Hock*, 655 P.2d at 1115.

One exception to this general rule can occur "if the transfer of property is made to one person, the purchase price is paid by another, and the transferee is a *wife, child or other natural object of bounty* of the person by whom the purchase

---

[3] Tingey also argues that the district court could not rule that a PMRT arose because the government acknowledged that the Family Trust held the beneficial interest in the cabin. But this argument simply repackages Tingey's already rejected waiver argument. We need not consider it further.

-12-

price is paid." *Id.* at 1116 (internal quotation marks omitted) (emphasis added) (citing Restatement (Second) of Trusts §§ 442, 443). In such a case, "a purchase money resulting trust will not arise unless the one paying the purchase price manifests an intention that the transferee should not have the beneficial interest in the property." *Id.* (citing Restatement (Second) of Trusts §§ 442, 443); *accord* Restatement (Third) of Trusts § 9(2).

"[I]t is the intention 'at the time of the transfer and not at some subsequent time which determines whether a resulting trust arises.'" *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1341 (10th Cir. 1998) (quoting Restatement (Second) of Trusts § 443 cmt. a). But "[t]he conduct of the payor and of the transferee subsequent to the transfer . . . may be such as to show that at the time of the transfer the payor did not intend to make a gift to the transferee." Restatement (Second) of Trusts § 443 cmt. a. Evidence indicating the payor's intent to retain the beneficial interest includes (1) "that the circumstances are such that the payor would have a reason for taking title in the name of another other than an intention to give him the beneficial interest . . . ; as, for example, where the payor had reasons for wishing that it should not be known that he was purchasing the property;" and (2) "that the payor manages the property, collects rents, pays taxes and insurance, pays for repairs and improvements, or otherwise asserts ownership, and the acquiescence by the transferee in such assertion of ownership." *Id.*; *accord* Restatement (Third) of Trusts § 9 cmt. c.

The district court found that the evidence established the predicate for a PMRT because Brown paid the purchase price for the cabin but had the legal title transferred to the Family Trust. It ruled, however, that the government nevertheless bore the burden of establishing that Brown did not intend the Family Trust to have beneficial ownership of the cabin; although the transferee was not Brown's "'wife, child or other natural object of bounty,'" it was a trust, the named beneficiaries of which "fall precisely into that category." Aplt. App. at 170 (Mem. Op. at 40) (quoting Restatement (Second) of Trusts § 442). Still, the court decided that the government had discharged its burden and that the Family Trust therefore held the cabin in a PMRT in favor of Brown.

### 2. Challenges to the Court's Ruling

### a. Who Purchased the Cabin?

A threshold requirement for a PMRT is that one person paid the purchase price for property but had legal title transferred to another person. *See In re Estate of Hock*, 655 P.2d at 1115. Here, the district court declared that "it was plainly apparent" that although the Family Trust was given legal title, Brown had paid the purchase price for the Ski Cabin. Aplt. App. at 169 (Mem. Op. at 39). The court relied on evidence that the Browns initiated and negotiated the purchase of the cabin, that Brown tendered the $5,000 earnest-money deposit using personal funds, that Brown tendered a cashiers check drawn from personal funds to cover the approximately $72,000 down payment on the cabin, and that Brown

-14-

signed and was personally obligated on the promissory note for the balance of the cabin's purchase price.

Tingey contests the district court's finding, pointing to Brown's testimony that the down payment from personal funds was a gift to the Family Trust and to evidence that "the Trust made many of the monthly loan payments to Jensen." Aplt. Br. at 26–27. But reviewing the finding for clear error, we see none. Even if a reasonable factfinder could have found that the trust purchased the cabin, it was not unreasonable for the court to find otherwise. Although Brown testified that the down payment was intended to be a gift to the Family Trust, the court correctly observed that the cashiers check was payable to the title company, not the trust; Brown "failed to deliver the funds to the Trust"; and "Tingey had no opportunity to accept the gift on behalf of the Trust." Aplt. App. at 179 (Mem. Op. at 49) (citing 38 Am. Jur. 2d *Gifts* § 14 (2010), as setting forth three requirements for a valid gift: (1) intention to give title and dominion; (2) delivery of the property; and (3) acceptance by donee). True, the Family Trust made many of the payments on the note, but the evidence showed that more came from Brown or sources closely connected to him. We further observe that the closing statements and other documentation support the view that Brown acquired the cabin for himself before turning it over to the trust.

### b. Can a PMRT Arise if an Express Trust Holds Title?

Tingey argues that the equitable remedy of a resulting trust is unavailable when an express trust holds the legal title to the property in question. In other words, Tingey questions whether an *express trust* can hold property in a *resulting trust* for the property's beneficial owner. Whether a PMRT can arise despite the existence of an express trust is a legal question, which we review de novo. *See Somerlott*, 686 F.3d at 1148.

We see no reason why an express trust cannot hold property in a resulting trust for its beneficial owner. Tingey correctly observes that a PMRT is an equitable remedy designed to implement the parties' intent. *See In re Estate of Hock*, 655 P.2d at 1114. But we cannot agree with his contention that the parties conclusively expressed their intent by creating the Family Trust and placing legal title to the Ski Cabin in the trust, thereby obviating the need to impose an equitable remedy to implement the parties' intent. No rule of human nature precludes the possibility that someone would purchase property to be held in the name of a trust while intending that the purchaser retain the beneficial interest, any more than it precludes a purchaser from transferring title to another person while intending that the purchaser retain the beneficial interest. One circumstance supporting a PMRT is that "the payor had reasons for wishing that it should not be known that he was purchasing the property." Restatement (Second) of Trusts § 443 cmt. a. It could undermine the PMRT doctrine to allow a person to evade it simply by using an express trust to conceal ownership.

Tingey relies on one case for the proposition that "if an express trust exists, there can be no resulting trust." *Gary-Wheaton Bank v. Meyer*, 473 N.E.2d 548, 552 (Ill. App. Ct. 1984). Of course, we are not bound to follow this state-court decision. *See Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1035 n.2 (10th Cir. 1998) (rejecting argument that "rel[ied] on non-binding case law from other jurisdictions"). But even considering it for its persuasive value, it provides only minimal support for Tingey's argument. The Illinois court provided no explanation for this proposition, and it held that there was inadequate evidence of a resulting trust anyway. *See Gary-Wheaton Bank*, 473 N.E.2d at 553–54. Moreover, the source of the proposition quoted in *Gary-Wheaton Bank* is the early case of *Kingsbury v. Burnside*, 58 Ill. 310 (1871), which, as we understand it, states only that once the court holds that property deeded by a grantor to a relative was under an express trust that it be held for the grantor's benefit, that holding disposes of any claim that the grantee holds the property under a resulting trust for the grantor. *See* Restatement (Second) of Trusts § 441 cmt. I (1959) ("Where a transfer of property is made to one person and the purchase price is paid by another, the fact that the payor and the transferee made an enforceable agreement that the property transferred should be held upon an express trust for the payor prevents a resulting trust from arising in favor of the payor, but there is an express trust for the payor."). The analog here would be if the Ski Cabin were

-17-

held in an express trust of which Brown was a beneficiary. The rule thus stated would not assist Tingey.

### c. Did the Government Prove that Brown Intended to Retain the Beneficial Interest?

Finally, Tingey challenges the district court's ruling that the government demonstrated by clear and convincing evidence that Brown intended to retain the beneficial interest in the Ski Cabin. *See In re Taylor*, 133 F.3d at 1341 ("[T]he proof required to impose a resulting trust [on property held in the name of the purchaser's spouse] must be strong, clear, and convincing, such as to leave no doubt of the existence of the trust.") (internal quotation marks omitted); *McGavin v. Segal (In re McGavin)*, 189 F.3d 1215, 1217 (10th Cir. 1999) ("[T]here must be clear and convincing evidence of the transferor's intent at the time of the transfer to retain a beneficial interest in the property [transferred by the purchaser to his spouse and to a limited partnership created for the benefit of his children]."); *see also Pate v. U.S. Dep't of Treasury IRS*, 949 F.2d 1059 (10th Cir. 1991) (applying same evidentiary standard for PMRT under Oklahoma law). We review the district court's findings of fact for clear error. *See In re McGavin*, 189 F.3d at 1217. But the legal consequences of those facts, including whether the intent found by the district court is the intent necessary to create a resulting trust, is a legal question, which we review de novo. *See id.*; *In re Taylor*, 133 F.3d at 1341.

The precedent most helpful to Tingey is *In re Taylor*. In that case we overturned a decision of the bankruptcy court (summarily affirmed by the district court) to impose a PMRT, giving a husband an equitable one-half interest in the home titled in his wife's name. *See In re Taylor*, 133 F.3d at 1342. The couple had purchased the home in 1973 and taken title in joint tenancy. *See id.* at 1339. In 1985 the husband conveyed his interest to the wife. *See id.* The bankruptcy court imposed a PMRT. *See id.* at 1339–40. It based its ruling on findings (1) that the husband's income was the primary source of the mortgage payments until 1985; (2) that although the husband had a much higher income than the wife until 1985, the couple treated the marriage as a financial partnership and considered both spouses' income as part of the joint family funds; (3) that the couple continued living together in the home after the conveyance and shared utility and insurance expenses, often paying expenses with checks signed by the husband; and (4) that the couple cosigned for a line of credit secured by the home and used at least half of the money for living expenses. *See id.*

We reversed, holding that these facts failed to establish that the husband intended to retain the beneficial interest. *See id.* at 1341. We pointed to findings by the bankruptcy court (1) that the husband had not transferred the home while insolvent or anticipating litigation; (2) that he had received consideration for the transfer because his wife shortly thereafter paid $25,000, apparently from an inheritance, to discharge the mortgage upon which the couple was jointly liable;

-19-

and (3) that he understood real estate transactions, "including the nature of equitable, as opposed to legal, interests in property." *Id.* at 1340 (internal quotation marks omitted). We also relied on the undisputed testimony that the husband transferred title "'because of estate planning and inheritance tax concerns after [his] heart attack,'" having watched his brother's widow experience difficulty selling a jointly owned home after the brother's death. *Id.* at 1341–42. We rejected the per se rule apparently applied by the trial court that a PMRT arises whenever a husband gifts his interest in a jointly owned home to his wife while continuing to live there and share expenses related to the home. *See id.* at 1342. We explained that "[a]s a practical matter such a rule would prevent transfers of title to the home between spouses to accomplish such objectives as avoiding probate and arranging the two estates to take advantage of the estate and inheritance tax laws exemptions." *Id.*

But with additional evidence of intent to retain a beneficial interest, we upheld the imposition of a resulting trust in *In re McGavin*, 189 F.3d at 1218. A husband had transferred his interest in the couple's home to his wife and had transferred personal property to a limited partnership created for the benefit of the couple's children. *See id.* at 1217–18. As to the home, we explained that "[t]he bankruptcy court made numerous and specific findings" demonstrating that the husband's "use and control of the [home] went far beyond residing in the home and paying taxes, insurance, and other household bills." *Id.* Moreover, in

contrast to *In re Taylor*, where the husband had merely cosigned for a line of credit using the home as collateral, the husband in *In re McGavin* had used the home "as collateral for various loans whose proceeds he controlled and used to enter into personal and business transactions for his benefit." *Id.* at 1217–18. As to the personal property, we pointed to similar findings by the bankruptcy court of the husband's use and control of the property after he transferred it to the partnership. *See id.*

We affirm the district court's determination that Brown had the beneficial interest in the Ski Cabin under a resulting trust.[4] There is no serious question that the record strongly supports the court's findings of fact. And those findings clearly distinguish this case from *In re Taylor* and provide at least as strong a case for a resulting trust as did the facts in *In re McGavin*.

In analyzing whether a resulting trust had been created, the district court emphasized the language in comment a to Restatement § 443 that

> the fact that the payor manages the property, collect rents, pays taxes and insurance, pays for repairs and improvements, or otherwise asserts ownership, and the acquiescence by the transferee in such assertion of ownership, is evidence to rebut the inference of an intention by the payor to make a gift to the transferee.

---

[4] We repeat what we said in footnote 1. For some reason the district court, after determining that a PMRT was created in favor of Brown, then stated, without further analysis, that he and his wife held the beneficial interest in the cabin. Tingey, however, has not complained about the court's determination that Mrs. Brown had an interest, so we need not address the matter.

Here, Brown, with acquiescence by the trustee, ignored the formalities of the trust in managing the property, making note payments out of personal funds that were not routed through the trust, taking care of maintenance, paying insurance premiums (on a policy that was in Brown's name), and even renting out the cabin without the trustee's knowledge.[5]  The court could quite reasonably infer that Brown had as much control of the property as he would have had if it had been in his own name.  And because he kept in his own name the title to the water rights that made the property marketable, the court could find that he had a functional veto on any sale or other transfer of the cabin.

If the district court had found that placing the Ski Cabin in the Family Trust served an estate-planning purpose, we would need to confront the policy concern expressed in *In re Taylor*, 133 F.3d at 1342, that PMRT doctrine not be used to undermine the probate and tax advantages of interspousal property transfers.  But there was no such finding.

What was found by the district court was a quite different purpose for putting assets in the Family Trust.  The district court apparently agreed with the government's contention that Brown knew when he created the trust that he was accruing significant tax and civil liabilities, and it credited the testimony of Tingey (the trustee of the trust) that Brown "wanted to create the Trust in part to

[5] Insofar as Mrs. Brown was involved in maintenance and paying bills, we agree with the dissent that her involvement is not probative of a resulting trust, although it is consistent with one (as the conduct of a supportive spouse).

set up an entity that would hold some assets separate and apart from him to protect *his assets* from creditors." Aplt. App. at 183 (Mem. Op. at 53) (emphasis added) (internal quotation marks omitted). If that was truly Brown's intent in creating the Family Trust (which was created within days of transfer of the Ski Cabin to the trust), then he considered the trust's assets as his own, not the beneficiaries'. Thus, the court reasonably concluded:

> Sheltering personal assets from the lawful claims of creditors is an intention distinguishable in its purpose from the donative intent to transfer assets to trust entirely for the benefit of others; one need not seek to *protect* personal assets from creditors if one is in fact giving them away without retaining any beneficial interest that a creditor may lawfully reach.

*Id.* at 183–84 (Mem. Op at 53–54). And noting how Brown used the Trust to conduct his personal business ventures, the court stated that "[t]hese activities reflect an intention to shelter personal investment activity that is readily distinguishable from the donative intent to 'gift' assets to the Trust solely for the benefit of the beneficiaries." *Id.* at 184 (Mem. Op. at 54).

There is authoritative support for the proposition that such an intent to shield assets from creditors can support imposition of a PMRT. Comment a to Restatement § 443 states that "the fact that it would be improvident for the payor to make a gift to the transferee is an indication that he did not intend to make a gift," and "the fact that the circumstances are such that the payor would have a reason for taking title in the name of another other than an intention to give him

-23-

the beneficial interest is an indication that he did not intend to make a gift, as, for example, where the payor had reasons for wishing that it should not be known that he was purchasing the property." Case law follows the Restatement. *See Bash v. Cunningham (In re Cunningham)*, Bankr. No. 06-14882, 2008 WL 2746023, at \*4–\*5 (Bankr. N.D. Ohio July 11, 2008) (property transferred to son to keep it from ex-wife)*; Nolan v. AT&T*, 61 N.E.2d 876, 883 (Ill. App. Ct. 1945) (stock put in daughter's name to avoid creditors); *Zundel v. Zundel*, 278 N.W.2d 123, 128–31 (N.D. 1979) (contract for deed was in son's name so that mother could avoid possible liability on mortgage).

In our view, the district court could properly find under the clear-and-convincing-evidence standard that familial affection was not the motivation for putting title to the cabin in the name of the trust and that the maneuver was nothing more than an attempt to keep ill-gotten gains from those entitled to recoup them. We may have seen the facts differently, but we are not the fact finders. The district court's findings were not clearly erroneous. We affirm the decision of the district court holding that the Ski Cabin was held by the Family Trust in a PMRT for the benefit of Brown.

## III. CONCLUSION

We AFFIRM the judgment of the district court.

-24-

12-4000, United States v. Tingey, et al.

**BRISCOE**, Chief Judge, dissenting**:**

Although I agree with much of the majority's carefully stated opinion, I must respectfully dissent. In my view, the government has not met its burden to produce "clear and convincing" evidence that Douglas Brown intended to retain a beneficial interest in the cabin. I would reverse and remand for further proceedings to determine if the IRS can enforce a lien under its alternate theory of fraudulent transfer, which the district court did not address.

## I

As the majority correctly notes, courts have imposed purchase money resulting trusts (PMRT) when the party that purchased a property in the name of relative demonstrates an intent to retain beneficial ownership. But we must remember that a PMRT is *not* an equitable remedy designed to benefit creditors (although they may, as in this case, benefit). It is an equitable remedy designed to "giv[e] effect to what was probably the intention of the purchaser." Restatement (Second) of Trusts ch. 12, topic 4, intro. note. This limits our inquiry to determining who the purchaser intended would hold the beneficial interest in this particular property. Put another way: had Douglas Brown brought an action in quiet title, would he have "clear and convincing" evidence that he did not actually intend to gift the property to the trust benefitting Barbara and the children?

In my view, he would not. Part of the evidence that the majority cites to rebut the presumption that Douglas intended the cabin as a gift for his wife and the children actually supports the conclusion that the cabin was, in fact, intended as a gift to his wife and the children. For instance, the majority considers it significant that Douglas Brown made payments on the note on the cabin. But paying for the property is a prerequisite of imposing a PMRT; it cannot serve as evidence to rebut the presumption that Barbara and the children held the beneficial interest. In fact, the trustee's co-signing of the note actually supports the view that the Family Trust was the beneficial owner, because it indicates that the parties anticipated the trust would make future payments. Cf. Restatement § 443 cmt. a ("It is the intention of the payor at the time of the transfer and not at some subsequent time which determines whether a resulting trust arises."). Douglas Brown would not be entitled to a PMRT for a share of the property he did not pay for.[1]

_____

[1] Along these lines, I also note the facts of this case make analyzing the question of ownership in this case complex. The payments on the cabin came from a number of sources, including Barbara. Neither the district court nor majority opinion grapples with how this might affect who possesses an interest in the cabin. Nor, although admittedly not raised by either party, did either the district court or majority consider the possibility that a resulting trust might be appropriate for only a share of the property. See Restatement (Second) of Trusts § 443 cmt. b. ("Where one person pays the purchase price for property which is transferred at his direction to another who is a natural object of his bounty, and it is shown that the payor intended to have a partial interest in the property, a resulting trust arises in favor of the payor as to such interest but only as to such interest.").

-2-

Morever, Douglas Brown took few actions with respect to the cabin that indicated an intent to remain the beneficial owner to the exclusion of his wife and the children, the named beneficiaries.  He did not exercise exclusive control of the cabin or use it to secure personal or business loans.  Cf. In re McGavin, 189 F.3d 1215, 1218 (affirming the imposition of a resulting trust when "bankruptcy court made numerous and specific findings about Debtor's continued control and use of the Prospector Property as collateral for various loans whose proceeds he controlled and used to enter into personal and business transactions for his benefit").  At worst, Douglas disregarded the formalities of the trust when he once rented the property to a friend without first obtaining permission from the trustee.  But, even so, the rent payments went toward the note on which the Trust was jointly liable.

The majority, however, emphasizes that Douglas Brown wanted to protect his assets from creditors.  Although I agree that an intent to protect assets from creditors is a factor in determining whether we should impose a PMRT, it is not the only one.  The Restatement (Second) of Trusts refers to this an "indication that [a purchaser] did not intend to make a gift."  § 443 cmt. a.  But it does not always follow that an intent to protect assets *requires* that we impose an PMRT.  Indeed, a purchaser could quite plausibly want to protect his assets *and* gift the property to his relatives.  Cf. Clayton v. Behle, 565 P.2d 1132, 1134 (Utah 1977) (holding an irrevocable, as opposed to revocable, trust was created in part based

on evidence that the "settlor informed his attorney that the purpose for the trust was to protect assets from all claims by third parties and to reserve and retain the ranch in the male family line").  I question the majority's decision to defer to the district court's "finding" that Douglas Brown intended *only* to shield his assets, as the district court apparently premised its conclusion on the belief that it is somehow inconsistent to possess both an intent to protect assets and an intent to gift them.

Indeed, the evidence supporting a conclusion that Douglas intended to retain a beneficial interest is far more ambiguous as to intent than the evidence in the cases cited by the majority.  In Nolan v. AT&T, 61 N.E.2d 876, 883 (Ill. App. Ct. 1945), the court held a father did not intend to gift stock to his daughter.  While the court considered the father's concerns about creditors as relevant, it also noted that he had used the stock as collateral for his own purposes before the daughter even knew the stock had been issued in her name.  Moreover, he told his attorney, banker, and sister—all non-interested parties who testified at trial—that he intended to retain a beneficial interest.  Id. at 883-884.  In addition, the father later sold the stock and kept the proceeds.  Id. at 883.

Likewise, in In re Cunningham, Bankr. No. 06-14882, 2008 WL 2746023, at *4, Bankr. N.D. Ohio July 11, 2008), the debtor's son, who held legal title, never claimed the property at issue as an asset.  The son also filed an affidavit asserting that his father's rights in the property would exist as long as the father

lived.  Id. at *5.  The father lived in the property, leased out the property, and paid all the taxes and insurance.  Id. at *4.  Not surprisingly, the court imposed a PMRT.  Id. at *7.

Similarly, in Zundel v. Zundel, 278 N.W.2d 123 (N.D. 1979), the court imposed a PMRT on the basis of testimony about a mother's actual intentions for property she had purchased in her son's name.  Four of her children testified that the mother had purchased the property in the son's name, as opposed to her own, *only* to avoid potential liability from a prior mortgage that had been foreclosed upon.  Id. at 126.  In addition, the "circumstances under which the land was farmed, income retained, improvements made and taxes paid are consistent with the intent to create a trust."  Id. at 131.  The mother "was a business woman raising a family without benefit of a husband and engaged in the operation of a farm of which farmland would be a vital necessity."  Id.  The court held that this all evidenced the mother's intention to retain the beneficial interest in the property.

The evidence in the case before us is much more mixed.  We have no evidence that the beneficiaries were unaware of their interest in the cabin, or that Douglas used it for his own purposes to the exclusion of the beneficiaries.  In fact, the trustee had long considered the cabin a trust asset, and Barbara and the children used the cabin for their own enjoyment.  More important, unlike in the three cases cited above, none of the parties with knowledge of this transaction has

-5-

made an assertion explicitly contradicting the presumption that Douglas intended the cabin as a gift for his wife and the children. While none of those cases, of course, defines the minimum level of evidence that must be presented for the imposition of a PMRT, the overwhelming evidence in each of them weakens their persuasive value as applied to this case. The courts in those cases did not need to rely as heavily as the majority does on the mere fact the purchaser wanted to protect his assets. Those courts had other evidence that made clear the purchaser intended to retain the beneficial interest.

## II

The majority also fails to grapple with the district court's error in treating the Browns as a single entity. The district court concluded that Douglas Brown purchased the cabin, yet held that the *Browns* were entitled to a PMRT in the cabin. The court did explain how Barbara can *retain* an interest in a property she did not purchase.

Relatedly, the district court should not have used Barbara Brown's actions as evidence to support the imposition of a PMRT in favor of Douglas. Barbara Brown's actions seem consistent with the presumption that Douglas intended the cabin as a gift for his wife and the children. Barbara used the cabin, helped with maintenance, and paid expenses.[2] That she did so without the oversight of the

---

[2] Although the district court found that the Browns paid the utility bills, the testimony it pointed to suggests that only Barbara paid them. Aplee. Supp.

(continued...)

-6-

trustee does not undercut the presumption that Douglas intended her and the children, as beneficiaries of the title-holding Family Trust, to also hold the beneficial interest in the cabin.

The majority seems to concede at least some err by the district court on this point. See Majority Op. at 22 n. 4 ("For some reason the district court, after determining that a PMRT was created in favor of Brown, then stated, without further analysis, that he and his wife held the beneficial interest."). But the majority offers two rejoinders. First, it says, "Tingey, however, has not complained about the court's determination that Mrs. Brown had an interest, so we need not address the matter." Id. But Tingey did argue that "the district court wrongly equated the Trust's beneficiaries' use and enjoyment of the Trust property with evidence that Mr. Brown, the purported purchaser, never intended for the Trust, as the purported transferee, to hold title to the cabin." Appellant's Opening Br. at 31.

Second, the majority says that "[i]nsofar as Mrs. Brown was involved with the maintenance and paying the bills, we agree with the dissent that her involvement is not probative of a resulting trust, although it is consistent with one (as the conduct of the supporting spouse)." Id. at 23 n.5. But this turns on its head the presumption that Douglas intended the cabin to be a gift. The default

---

[2](...continued)
App. at 157, 165.

assumption should be that Barbara took these actions in her role as beneficiary—not merely as "supporting spouse." One could just as easily conclude that much of the evidence the majority cites to support its position the Douglas retained the beneficial interest is also "consistent" with the presumption this was a gift: *Douglas* acting as the "supportive spouse" who took actions beyond making the initial down payment to ensure that his wish to gift the cabin was fulfilled.

### III

In light of this, I cannot agree that the government has met its high evidentiary burden to rebut the presumption that no PMRT was created in favor of Douglas Brown. Both the majority and the district court failed to give appropriate weight to the presumption that Douglas Brown purchased the cabin as a gift for his wife and children. Rejecting this approach, I would instead reverse and remand for further proceedings.